THERIOT, J.
[{■Defendant, Derrick Bland, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30,1. He pled ¡not guilty and, following a jury trial, was found guilty as charged. Defendant subsequently filed motions for new trial and postverdict judgment of acquittal.[1] In a written ruling, the trial court denied the motion for new trial, but granted the motion for postverdict judgment of acquittal and reduced defendant’s conviction to negligent homicide, a violation of La. R.S. 14:32. Defendant has not been sentenced.[2] The state now appeals, alleging a single assignment of error argu *682 ing that the trial court erred in granting defendant’s postverdict judgment of acquittal. For the following reasons, we reverse the trial court’s ruling granting the motion for postverdict judgment of acquittal, reinstate the jury’s verdict finding defendant guilty of second degree murder, and remand for sentencing.

FACTS

On July 28, 2013, Matissie Stockton and her husband, James (the victim), hosted a birthday party for one of Matissie’s brothers, Cedric Tyrone Bester,[3] at their apartment in Baton Rouge. Defendant, Derrick Bland, lived in the apartment with Matis-sie, James, their daughter, and Cedric. Defendant is the brother of both Matissie and Cedric.
| ^Defendant began drinking alcohol within only a few hours of waking up on the morning of the party. He continued to drink throughout the course of the day and into the evening hours. Around 8:00 p.m., defendant and Cedric began to argue. Shortly thereafter, defendant and James also had a verbal altercation, ending with James telling defendant to leave the apartment.
Approximately thirty minutes later, James, Matissie, and their daughter began to exit the apartment to bring James’s sister a phone charger. As she walked out of the apartment, Matissie saw defendant standing under a tree located near the apartment. She then witnessed as defendant began to fire a handgun in the direction of her husband. Defendant fired a total of six shots — three striking James as he stood, and three striking James as he lay on the ground. James died at the scene as a result of his wounds. Defendant fled the scene and disposed of his weapon at a friend’s apartment. He turned himself in to the police the following day.
On these facts, the jury returned a unanimous verdict finding defendant guilty of second degree murder. The trial court subsequently granted defendant’s motion for postverdict judgment of acquittal and reduced his conviction to negligent homicide. The trial court’s primary justification for reducing defendant’s conviction was its determination that it was unreasonable for the jury to find that defendant had the specific intent to kill James, given defendant’s level of intoxication on the day of the incident.

POSTVERDICT JUDGMENT OF ACQUITTAL

In its sole assignment of error, the state contends that the trial court erred in granting defendant’s motion for a postver-dict judgment of acquittal and reducing his conviction to negligent homicide. Specifically, the state argues that it sufficiently proved the specific intent element required to Usupport a second degree murder conviction, even considering the evidence regarding defendant’s intoxication. We agree.
A postverdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty. La.Code Grim. P. art. 821(B). If the court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a postverdict judgment of acquittal, may modify the verdict and render a judgment of conviction *683 on the lesser included responsive offense. La.Code Crim. P. art 821(C).
A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const, amend. XIV; La. Const, art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, this court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La.Code Crim. P. art. 821(B); State v. Ordodi, 2006-0207 (La.11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988). The Jackson standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence', both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludés every reasonable hypothesis of innocence. State v. Patorno, 2001-2585 (La.App. 1st Cir.6/21/02), 822 So.2d 141, 144.
When a conviction is based, on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that | (¡evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient Tor a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Wright, 98-0601 (La.App. 1st Cir.2/19/99), 730 So.2d 485, 487, writs denied, 99-0802 (La.10/29/99), 748 So.2d 1157 & 2000-0895 (La.11/17/00), 773 So.2d 732.
As is relevant to this case, second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is defined as the state of mind, which exists when the circumstances indicate that the' offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1).
Specific intent is a legal conclusion to be resolved ultimately by the trier of fact. State v. Gibson, 460 So.2d 689, 692 (La.App. 1st Cir.1984), writ denied, 464 So.2d 1376 (La.1985). Since specific criminal intent is a state of mind, it need not be proven as a fact, but it may be inferred from the circumstances present and action of the defendant. Id. Such state of .mind can be formed in an instant. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382, 390.
Voluntary intoxication is a defense to a prosecution for second degree murder only if the circumstances indicate that it has precluded the presence of specific criminal intent. See La. R.S. 14:15(2). When defenses that defeat an essential element of an offense, such as intoxication, are raised by the evidence, the state must overcome the defense by evidence which proves beyond a reasonable doubt that the mental element was present despite the | fialleged intoxication. State v. Lutcher, 96-2378 (La.App. 1st Cir.9/19/97), 700 So.2d 961, 973, writ denied, 97-2537 (La.2/6/98), 709 So.2d 731.
In the instant case, there is no dispute as to defendant’s identity as the person who shot and killed James Stockton. Rather, the sole issue is whether defendant’s level of voluntary intoxication on the day of the incident prevented him from forming the specific intent .to commit a second degree murder.
*684 At trial, three witnesses testified regarding the circumstances surrounding the day of the incident and the shooting: Matissie Stockton,' Cedric Tyrone Bester, and defendant. ' Matissie Stockton stated at trial that she saw defendant start to drink in the morning on the day of the incident, beginning with a Four Loko and a Budweiser. She testified that her mother-in-law and sister-in-law provided about $300 worth of 'alcohol, including both liquor and beer, for the party. She estimated that defendant drank over a fifth of liquor and a six-pack of beer by himself. Matissie testified that she had seen defendant drink alcohol before, but she had. never seen him behave the way he did on the day of the party.
Matissie described that,- prior to the shooting, defendant got into an argument with Cedric. Thereafter, defendant began to argue with James. During this argument, James apparently told defendant, “Bitchi get your ass out of my house.” Matissie could tell that defendant became angrier during his argument with James.
After defendant left the apartment, James’s sister called and asked him to bring over a phone charger. James, Ma-tissie, and their daughter exited the apartment together to travel to James’s sister’s residence.-, As |7Matissie walked outside, she saw defendant under a nearby tree.[4] She then witnessed as defendant began to fire a gun in James’s direction. Matissie heard six- shots in total — three while James was standing, and three additional shots after James fell to the ground. According to the coroner, all six bullets hit James. Matissie could not remember what defendant did after he shot the victim, but she knows that she did not see him remaining around the scene.
Cedric Tyrone Bester testified that, on the morning of the incident, he purchased defendant a Four Loko and Budweiser to drink before the party.. He stated that there was “a lot” of alcohol available at the party and also estimated the total cost to be approximately $300. Cedric described that there was a gallon each of gin and vodka, in addition to a couple of cases of beer. Cedric testified that defendant started the day by mixing his liquor with juice, but as the day went on, defendant began to drink .liquor straight over ice. Cedric estimated that defendant drank over a fifth of alcohol and approximately a case of beer by himself.. He stated that he had never seen defendant “drunk like that.” Cedric admitted that he also had a lot to drink on the day of the incident, but he stated .that he did not black out.
Cedric testified, that he and defendant argued prior to defendant’s argument with James. According to Cedric, James argued with defendant and eventually told him, “Bitch, .get the f — k out my house.” Cedric stated that he was in -the front room of the apartment when James, Matis-sie, and their daughter exited the apartment. He heard gunshots and ran outside to see James lying on the ground. Cedric stated that he did not see who shot the victim. He explained that he lied to the police when he told them that he had seen defendant shoot James.
| ¡^Finally, the defendant testified on his own behalf. He stated that he began the day by drinking a Four Loko and a beer. Defendant described the alcohol available at the party as “a couple gallons, some half gallons of brown and white [liquor],” as well as about five eases of beer. He stated that because he did not pay for the alcohol, he decided to have as much as he wanted. Defendant described that he first mixed *685 gin with a small" amount of juice, but he later moved on to drinking straight vodka over ice. He stated that he drank “over five” sixteen-ounce cups filled with vodka, but he could not remember the "exact number. During defendant’s testimony, defense counsel demonstrated that thirteen one-ounce “shots” of alcohol could fit into one sixteen-ounce cup. According to defendant, he did not eat anything on the day of the incident. He stated -that he began to lose his memory around the time- he walked to a nearby apartment to bring friends some alcohol. He realized then that he was staggering-when he walked.
Defendant testified that he argued-with his brother Cedric later in the evening. When he asked for James to jump into the argument on his side, James instead began to argue with defendant. According to defendant, James called him a “bitch” and told him to get out of the apartment. Defendant was clear that James did not physically assault him during the argument.
Defendant left the apartment and walked to a nearby gas station to purchase cigarettes. Defendant then returned to the area of the apartment. • He .testified that he did not retrieve a gun, but had been armed with a gun all day because he ,did not know all of the' guests who were invited to the party, and he wanted to be prepared.
With respect to the shooting, defendant stated he remembered “flashes of it.” He described it as a “reflex thing,” meaning that when the apartment |9door opened, James’s voice was the first thing he heard, leading him to believe that James was coming to confront him again. However, defendant was clear that he was not pleading self-defense. Defendant simply-said that when he pulled the trigger, he “wasn’t really thinking, [he] just reacted.” Defendant did not recall how many shots he fired, but he would “have to agree” with six: - He stated that: he did not remember ever wanting to kill James or hurt him badly, though he did remember being angry with the victim.
Defendant further testified that after the shooting, he went to his friend Nadia’s house to secure a ride somewhere away from the area. When she refused, defendant left'the gun on her table and began to walk away from the area. He eventually fell asleep beside a railroad track. The following morning, defendant had his uncle drive him to the parish prison so he could "turn himseif iñ'to the police.'
In its written, ruling granting defendant’s motion for postverdict judgment of acquittal, the trial court stated that defendant’s claim of intoxication was proven by a preponderance of the evidence through two of the state’s own witnesses. The trial court found that the state’s proof of specific criminal intent was limited. The trial court stated ‘that no witnesses testified that defendant threatened to kill or harm the victim, that defendant did not'yell obscenities or negative comments in the act of shooting, and that the state did not introduce'adequate circumstantial, evidence for the jury to infer the requisite specific .criminal intent. Ultimately, the trial, court found that j‘[i]t was unreasonable then for the jury to. conclude or infer from [defendant’s] own actions that he had the specific intent to kill [the victim.]” In. finding negligent homicide to be the more appropriate verdict, the trial court cited defendant’s testimony (coupled with defense counsel’s | ^demonstration) and the testimony of two state witnesses that he had. consumed at least five cups of alcohol, each containing approximately thirteen one-ounce shots. Thus, the trial court, found that defendant’s intoxication contributed to the fatality.
*686 We find the trial court’s ruling to be clear legal error. In contrast to the trial court’s written ruling, we find a substantial amount of circumstantial evidence supports the jury’s conclusion that defendant had the specific intent to kill the victim. First, the uncontroverted evidence presented at trial demonstrates that defendant shot the victim six times, resulting in the victim’s death. Qf these six shots, three of the , shots came after the victim had fallen to’the ground. While defendant might have begun to fire the weapon from beneath a tree near the apartment, one shell casing was found near the victim’s feet, and two more were located in the doorway of the apartment. When combined, this evidence supports a reasonable conclusion that defendant fired the final three shots at a relatively close range to the victim, while the victim was already on the ground after being struck by the initial three bullets. Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill. State v. Broaden, 99-2124 (La.2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001), rehearing denied, 534 U.S. 1172, 122 S.Ct. 1198, 152 L.Ed.2d 137 (2002). The accuracy of the six shots coupled with the number of shots fired and the circumstances surrounding'the shots are strong circumstantial evidence that defendant- acted with a specific intent to kill the victim.
Additionally, the state proved that there was no physical confrontation between defendant and the victim either prior to, or during, the shooting. Defendant himself admitted that he was angry with the victim, and he began Into shoot at the victim simply upon hearing the victim’s voice .as he exited the apartment. Defendant’s decision to .shoot the victim with no provocation is also strong evidence of a specific intent to kill.
Finally, defendant’s actions following the shooting are indicative of his immediate knowledge that he had committed a criminal .act. After the shooting, defendant ran to a friend’s apartment, where he unsuccessfully. attempted to secure a ride. Upon being rebuffed, defendant disposed of his weapon and fled farther away from the scene. Defendant clearly stated at trial that he fled because he was worried about being found by the police. A finding of purposeful misrepresentation, as in the case of flight following an offense, reasonably raises the inference of a “guilty mind.” State v. Captville, 448 So.2d 676, 680 n. 4 (La.1984).
We do recognize that the evidence of defendant’s intoxication on the day of the incident is not insignificant. By all accounts, defendant began to drink alcohol early in the day, and he continued to consume alcohol continuously throughout the party. While it is uncontroverted that defendant drank a substantial amount of liquor, the jury may have reasonably rejected defendarit’s own testimony that he ingested at least five sixteen-ounce cups, each containing approximately thirteen one-ounce shots of alcohol. The jury’s overall rejection of defendant’s intoxication defense could have been based on defendant’s ability to remember a substantial portion of the day’s events, by defendant’s accurate firing of three shots at the victim from a distance (with no stray bullets hitting Matissie or her daughter), followed by three additional shots at close range, and by defendant’s immediate recognition of his criminal act. Such evidence indicates that defendant’s firing of the gun was not a reflex action. Contrary to defendant’s claim that his intoxication was so severe as to preclude the formation of specific intent, |12the evidence showed that 'he had the ability to make decisions and reason. See State v. Guess, 47,370 *687 (La.App.2d Cir.8/8/12), 104 So.3d 41, 47, writ denied, 2012-1987 (La.3/8/13), 109 So.3d 357. The overall evidence was sufficient to allow the jury to reject the claim of intoxication and find that the staté negated that defense by proof beyond a reasonable doubt. • -
In the instant case, any rational trier of fact, viewing the evidence presented in this ease in the light most favorable to the state, could find that the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder. The trial court did not view the evidence in the light most favorable to the state; rather, it substituted its own appreciation of the evidence for that of the jury. An appellate court is constitutionally precluded from acting as a “thirteenth juror” in assessing the weight of the evidence, see State v. Mitchell, 1999-3342 (La.10/17/00), 772 So.2d 78, 83, and the trial court is precluded from doing the same when the trier of fact has reached a reasonable conclusion based on the evidence.
When a case involves circumstantial evidence and the fact finder reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. Captville, 448 So.2d at 680. We find no such hypothesis exists in the instant ease. The unanimous verdict returned by the jury indicates it rejected, defendant’s theory of innocence based on intoxication, and found him to have acted with the specific intent to kill James Stockton. The record clearly supports the jury’s findings. Further, in reviewing the evidence, we are unable to say that the jury’s determination was irrational under the facts and circumstances presented to it. See Ordodi, 946 So.2d at 662. A court .errs by substituting |1sits appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the. basis of an exculpatory, hypothesis of innocence presented to, and- rationally rejected by, the jury. See State v. Calloway, 2007-2306 (La.1/21/09), 1 So.3d 417, 418 (per curiam). Accordingly, we find the trial court erred in granting defendant’s motion for a postverdict judgment -of acquittal.
MOTION TO DISMISS APPEAL DENIED; POSTVERDICT JUDGMENT OF ACQUITTAL REVERSED; SECOND DEGREE MURDER CONVICTION REINSTATED; REMANDED FOR SENTENCING.
McDONALD, j. assigns additional reasons.
McDONALD’ J.,
assigning additional reasons:
| ! While I agree with the majority opinion, I take this opportunity to additionally comment that the trial judge’s decision in this case was an injustice ,to the victim, to the citizens of the State of Louisiana, and to our criminal justice system. In eleven pages of written reasons, the judge attempts to justify reducing this obvious second degree murder conviction to a negligent homicide conviction. The judge lists twelve so-called “undisputed facts” but fails to mention other facts that plainly prove the intent of the defendant to kill the victim. To ignore the facts does,not change the facts.
Louisiana Code of Criminal Procedure article 821' B. provides:
A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.
*688 The'judge was evidently aware of the proper’ standard of review for a post verdict judgment of acquittal but apparently did not apply it. Citing La.C.Cr.P. art. 821, the judge states, “The statute states that the court can grant a post verdict judgment of acquittal only if the Court finds that the evidence viewed in a light most favorable to the State, does not reasonably permit a finding of guilty of the offense charged.”[1] However, -the judge’s interpretation of the statute makes this casé even more egregious. Article 821 is not discretionary as the judge suggests, it is mandatory. It states that the court “shall ” grant a post verdict judgment of acquittal, not that it “can.” .However, Article 821 also contains a huge restriction-fcthat is, a post verdict judgment of acquittal can only be granted- if the evidence viewed in a light most favorable to the State, does not reasonably permit a finding of guilt.
In misapplying this standard, the judge states:
The evidence presented by the prosecution about Dérrick Bland’s mental capacity, as it relates to proof of “specific criminal ' intent”, [sic] was ■ limited. There were no witnesses- that testified that Derrick threatened to kill or harm James. Derrick did not yell any obscenities or negative comments when he was “in the act of shooting”, [sic] The State did not introduce sufficient testimonial evidence that proved that Derrick had the requisite mental capacity. Neither did the State introduce adequate' circumstantial evidence where one could infer that Derrick had the requisite “specific criminal intent” to kill James.
Additionally, the judge states, “Derrick remembered the shooting, but could not recall a lot about what happened that day. He was able to share in open court the limited things that he could remember.” It seems the judge ignored the defendant’s recollections and failed to interpret them in a light most favorable to the state. There is no question that the defendant had been drinking that day, maybe even quite heavily. However, he had a great amount of recall about the incident and the events of that day. His recollection indicates he had an understanding of what he was doing and the consequences.
After James .Stockton told the defendant to leave the apartment, the defendant remembered walking to the Texaco station to purchase cigarettes. He remembered that it usually took him seven minutes to get there, but this time it took him twenty minutes and he was almost struck by a car. Upon his return, he stood by a tree until Mr. Stockton came outside accompanied by Matissie (the defendant’s sister and Mr. Stockton’s wife) and Matissie’s daughter. The judge found' that the defendant “heard James’ voice and thought that James was going to confront him.” This certainly indicates that the defendant was aware of his situation and what was happening at the time. The facts indicate that the defendant |sshot three times as the three exited the apartment. However, all three shots struck the victim, James Stockton. None of the shots missed; none hit either . of the other two individuals. And then, in order to insure Mr. Stockton was dead, the defendant walked over to him and shot him three additional times as he lay on the ground. Realizing the trouble he was in, the defendant went to his girlfriend’s apartment and asked that she take him out of town. When she refused, he left the gun with her.
*689 ■ The above described facts do not describe the acts of an inebriated person who had no idea what he was doing. These acts were not “reflex” acts as the defendant suggests. Rather, these acts were deliberate acts specifically intended to kill the victim, it is hard to understand how the judge came to an opposite conclusion. Even if the evidence was not viewed in a light' most favorable to the state, the record is repléte with facts that indicate the defendant had the requisite criminal intent to kill the victim.

. The motion filed by defendant is titled "motion for modification of verdict.” This motion utilizes the same' standard of review found in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), as does a motion for postverdict judgment of acquittal. See State v. Heck, 560 So.2d 611, 614 (La.App. 4th Cir.1990), writ denied, 566 So.2d 395 (La.1990). The motions are therefore interchangeable, and we shall refer to the motion as a motion for postverdict judgment of acquittal.

. We note that defendant has filed a motion to dismiss, alleging that the state’s appeal is premature because defendant has not been sentenced. However, in a situation where a postverdict judgment of acquittal is granted or a verdict is modified, the state may seek review by appealing to the appropriate appellate court.' See La, Code Crim. P. art. 821(D); see also State v. Korman, 439 So.2d 1099, 1100 (La.App. 1st Cir.1983) (noting that where a trial, court finds the evidence legally insufficient to support a guilty verdict, such a judgment is reviewable by the appellate courts on application of the state). While defendant cites State v. Quinones, 94-0436 (La.App. 5th Cir.11/29/94), 646 So.2d 1216, 1217, as support for his motion to dismiss, that case did not discuss the applicability of Article 821 and is not binding on this Court; thus we maintain this appeal.

. Cedric is referred to as both “Cedric” and "Tyrone” in the trial transcript. For clarity, we use "Cedric" throughout this appeal.

. Matisse estimated the tree to be approximately seven feet from the apartment's door, but in photographic evidence this tree appears to be a distance slightly farther away.

.” La.C.Cr.P. art 821 codified the constitutional standard for testing the sufficiency of evidence enunciated in the U.S, Supreme Court decision of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).