STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 KA 0406

STATE OF LOUISIANA

VERSUS

WALTER ROSARIO-COLON

Judgment Rendered: September 27, 2019

********

Appealed from the 32nd Judicial District Court
In and for the Parish of Terrebonne
State of Louisiana
Case No. 735365

The Honorable Juan W. Pickett, Judge Presiding

********

| | |
|---|---|
| Joseph L. Waitz, Jr. | Counsel for Appellee |
| District Attorney | State of Louisiana |
| Ellen Daigle Doskey | |
| Assistant District Attorney | |
| Houma, Louisiana | |
| | |
| Bertha M. Hillman | Counsel for Defendant/Appellant |
| Covington, Louisiana | Walter Rosario-Colon |

********

BEFORE: HIGGINBOTHAM, PENZATO AND LANIER, JJ.

**LANIER, J.**

The defendant, Walter Rosario-Colon, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty. Following a jury trial, he was found guilty as charged by unanimous verdict. He moved for a post-verdict judgment of acquittal and a new trial, but the motions were denied. He was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. He now appeals, contending the evidence was insufficient to support the verdict. For the following reasons, we affirm the conviction and sentence.

## FACTS

On September 18, 2016, the defendant struck the victim, Antonio Aguado, with a pool cue/pool stick at Los Amigos, a bar in Houma. The pool cue entered the victim's skull and brain. Dr. Charles Joseph Ledoux, deputy coroner for Terrebonne Parish, performed the autopsy of the victim. Dr. Ledoux listed the victim's cause of death as severe open head injury, depressed skull fracture, and destruction of cerebral matter.

At the time of his death, the victim was thirty-three years old, 5' 10" tall, and weighed 220 lbs. Dr. Ledoux indicated the victim had a 3 cm. (approximately 1.25 inch) "circular defect," above and behind his left ear extending three or four inches into the intracranial cavity. Dr. Ledoux opined that the injury was consistent with being stabbed with a pool cue, adding that the victim's brain "kind of fell apart from the trauma." Dr. Ledoux did not find any evidence of injury consistent with being struck by a pool cue on the side of the victim's head.

Dr. Ledoux testified that at the time of this incident, the victim had a blood alcohol concentration of 0.237 milligrams per deciliter. He indicated that this was not a lethal level, but would have resulted in impaired judgment, reduced alertness, and impaired muscular coordination.

2

Dr. Ledoux agreed with the defense hypothetical that multiple blows to or dropping of the victim's head after the pool cue strike could have increased his chance of death, but only "if ... accompanied by brain damage." Dr. Ledoux also agreed, however, that if the victim's head had been pounded on the ground sufficient to cause additional brain damage, he would have suffered additional external injuries to his head. Dr. Ledoux found no additional external injuries to the victim's head.

The trial court permitted Steven Gregory Lee to give general information on behalf of the defendant in the field of pathophysiology—the study of what happens to cells and tissues in disease states or secondary to trauma. After reviewing the victim's autopsy, Lee indicated the victim's brain was injured on the border of the parietal and temporal areas. Lee testified the parietal lobe is responsible for understanding language, behavior, memory, and hearing, but does not control any "life critical features." Lee indicated the victim's brainstem, however, appeared normal, noting that the brainstem controls breathing, blood pressure, heart beat, and swallowing. Dr. Ledoux explained that the "[b]rainstem is roughly speaking, where the brain goes into the spinal cord, at the base of the skull."

Lee also testified that "predictable behavior" for someone with the victim's blood alcohol level of 0.237 would include judgment impairment, loss of balance, anger, possibly combativeness, lack of inhibition, and poor decision making. He also indicated, however, that alcohol affects people differently, and that drowsiness was also a general characteristic at the victim's blood alcohol level.

Anthony Joseph Jurado was working as a DJ at the bar on the night of the incident. He exited the DJ booth when the defendant was screaming loudly at the victim. Jurado did not see the victim "swing at, or provoke" the defendant. According to Jurado, "[the victim] started to laugh and turned around to head towards the entrance door. [The defendant] raised the pool [cue] and he stuck it in his head.

3

... The cue-tip broke in half. It fell on the floor. The sticker [sic] part fell on the floor. The skinny part was inside his head."

Filiberto Laria Mendez and his girlfriend, Anna Seguna, were with the victim at Los Amigos on the night of the incident. When they arrived at the bar, they sat at a table with Katherine Batista, the defendant's girlfriend, and bought a bucket of six beers. Mendez only heard the victim say "cheers" to Batista. He saw the defendant leave the pool table, talk to the victim at the table, and then return to the pool table. He denied the victim confronted the defendant, stating, "do we have a problem here?" Mendez indicated when they were about to leave, Nicia Fernandez, the owner of Los Amigos, came to the table, asked if everything was okay, and they answered affirmatively. He denied that the victim hit or pushed Fernandez, as the defendant claimed. Thereafter, the victim went to the defendant to say goodbye. Mendez stated the defendant did not want to say goodbye to the victim and hit the victim with the pool cue "from behind." He claimed the defendant hit the victim with the small end of the pool cue, and the pool cue broke. Mendez testified the victim had nothing in his hands when he approached the defendant and did not try to punch, hit, or provoke the defendant. Mendez denied hitting the victim's head on the ground, as alleged by the defense.

Seguna testified that when she sat at the table, the defendant and another man were also there, but then they got up to play pool. After the victim sat down at the table, he told Batista she was very pretty and opened a beer and gave it to her. Batista said she already had one, and the victim said "cheers." Thereafter, she stood up, went to talk to the defendant, then returned to the table. The defendant approached the victim and told him "to his ear," not to bother Batista because she was his girlfriend. According to Seguna, the victim said "[t]hat's okay. That's not a problem," and the defendant went back to playing pool. Fernandez then came to the table to see if everything was okay. After Fernandez left, Seguna stood up and as she

4

and Mendez were leaving, the defendant "planted the cue stick on the head of [the victim]." Seguna indicated the victim only approached the defendant to shake his hand and say goodbye, but "[the defendant] didn't say anything." Seguna denied the victim had any kind of weapon in his hand and also denied the victim tried to swing at, punch, fight, or provoke the defendant.

On the night of the incident, Alfredo "Peter" Martinez Nacar called the defendant from Los Amigos and invited him to the bar. Nacar was also friends with Mendez and let the victim, Mendez, and Seguna into the bar through a back door. According to Nacar, Batista approached him after the victim began "accosting her." Nacar explained the victim was accosting Batista, "[j]ust by the way he was looking at her." He conceded the victim never touched Batista. The defendant then approached the victim in a "peaceful way" and told him "please not to behave that way." Nacar testified the victim "stood up, upset," but the defendant went back to the pool table to continue playing pool. Nacar stated the defendant hit the victim after the victim went over to the defendant "with a look of anger." Nacar claimed the defendant hit the victim once with the pool cue as he was approaching the defendant. He indicated the strike was "from up" and more "like chopping wood" than swinging a baseball bat. Nacar did not see any weapons in the victim's hands when he approached the defendant. Nacar also testified the victim tried to hit the defendant, but conceded he had not previously made that claim. He later clarified his testimony, stating that the victim "wanted to hit [the defendant], but he didn't get to him."

Awilda Jucino Rivera was present at Los Amigos on the night of the incident. She testified she saw that Batista was "very nervous" and that she saw the victim grab Batista by the upper arm. She claimed that she heard from afar "something like respect my lady." She then claimed she saw the victim "going at" the defendant "as if they were going to fight." Rivera conceded she suffered from psychosis.

5

Cindy Vega was also present at Los Amigos on the night of the incident. She testified that after the victim was on the ground, Mendez raised him three or four times, trying to make him react. She indicated, during that time, the victim's head was hitting against the legs of a chair until someone moved the chair.

Fernandez testified that she approached the victim the night of the incident because she saw "there was going to be a problem." She thought the victim was angry, because according to Fernandez, he was looking over in the direction of the defendant and refused to look at her. Fernandez testified the victim pushed her onto a table and began running at the defendant. She conceded, however, she had previously stated the victim walked toward the defendant. She then saw the pool cue in the air "like doing a baseball swing." She testified that the pool cue did not enter the victim's head. Fernandez also testified that Mendez tried to help the victim when he was on the ground. She said Mendez repeatedly lifted the victim up, but then would let him fall, and the victim "hit hard."

Batista testified she and the defendant were at Los Amigos on the night of the incident for a birthday party. According to Batista, after the defendant got up to play pool, the victim tried to "enamor [her]." She testified she felt uncomfortable and intimidated. She claimed the victim started taking beers from her bucket of beer "so we would toast," and she asked Seguna to speak to the victim so that he would leave her alone. Batista stated she tried to stand up, and the victim grabbed her left arm, so she sat back down and started playing with her cell phone. Thereafter, the defendant noticed she looked uncomfortable and asked her what was wrong. Batista told the defendant what had happened. The defendant spoke to the victim, then went back to playing pool.

Batista testified that the victim pushed Fernandez aside when she came to the table to talk to him and ran toward the defendant. Batista claimed the defendant was bent down over the pool table and had his back to the victim as the victim

approached him. She also claimed someone shouted "Papote," the defendant's nickname, to warn him "they" were coming to hit him. She saw the defendant strike the victim with the small end of the pool cue and then punch Mendez when he came up "to hit" the defendant. Batista saw the pool cue break but did not see it go into the victim's head.

The defendant testified at trial. On the night of the incident, the defendant went to Los Amigos to watch a boxing match, but sat at a table with Batista near the pool table because someone she knew was having a birthday party there. During the evening, Mendez, with whom the defendant was acquainted, brought the victim and Seguna to the table. The defendant welcomed them and gave up his seat to Seguna. The defendant then went to play pool.

The defendant returned to the table, however, to check on Batista because she had her head down and to the side. Batista told the defendant, "they weren't respecting her." The defendant testified he told the victim, "please don't disrespect my wife."[1] According to the defendant, the victim got up, "looked at [the defendant] tough," and asked the defendant if he wanted to fight about it. The defendant claimed he declined the offer to fight, told the victim he just wanted him to respect Batista, and put his hand out to shake hands. According to the defendant, the victim looked at the defendant's hand, looked at the defendant, and then shook hands with him. The defendant told the victim, "it's over here, nothing happened," and that the defendant did not want any problems. The defendant claimed the victim said, "if you don't want any problems, play pool with me," and that he replied, "okay, no problem, but you have got to put money in the line." The victim did not put up any money to play pool, but the defendant left to play pool.

The defendant testified he was playing pool for two or three minutes and was bent over to see a play, when he heard a noise from some woman. He testified, "I

---

[1] Batista and the defendant referred to each other respectively as husband and wife because they lived together, but they admitted they were not legally married.

turned this way; and [the victim] was coming, ready to hit me; and I just went like this." The defendant claimed he turned to "block the hit, and to defend [himself]." He claimed Mendez "almost immediately" was also running at him. The defendant stated he did not know what he had done with the pool cue and did not know how hard he hit the victim with the pool cue because it "was a reaction." He denied having time to think about defensive techniques. The defendant indicated he was afraid the victim would hit him and was afraid "for [his own] life." He denied he had any intention to hurt the victim and denied swinging the pool cue. He denied jabbing the pool cue in the victim's head with enough force to break the victim's skull and also denied using the pool cue as a hatchet.

## SUFFICIENCY OF THE EVIDENCE

In his sole assignment of error, the defendant argues the evidence was insufficient to support the conviction because he acted in self-defense when he struck the victim.[2]

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Mitchell**, 2016-0834 (La. App. 1 Cir. 9/21/17), 231 So.3d 710, 731, writ denied, 2017-1890 (La. 8/31/18), 251 So.3d 410.

---

[2] Defendant alternatively argues that the evidence presented was only sufficient to convict him of negligent homicide or manslaughter. Because we ultimately conclude, as discussed herein, that the evidence was sufficient to support the defendant's conviction of second degree murder, we pretermit consideration of the defendant's alternative arguments.

8

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When analyzing circumstantial evidence, La. R.S. 15:438 provides that, in order to convict, the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. The facts then established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **State v. Watts**, 2014-0429 (La. App. 1 Cir. 11/21/14), 168 So.3d 441, 444, writ denied, 2015-0146 (La. 11/20/15), 180 So.3d 315.

**Second Degree Murder**

Second degree murder, in pertinent part, "is the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1). Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. Specific intent need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. **Mitchell**, 231 So.3d at 732.

The theory of the State was that the defendant killed the victim by stabbing him in the head with a pool cue with enough force to break it "just like you would a pole vault." The State relied on this "offensive move" to establish the defendant's specific intent to kill or inflict great bodily harm.

The State noted if the victim would have been attacking the defendant, the defendant would have struck him with a frontal blow. The State also noted the victim had "nothing in his hands." According to the State, the killing was not

9

justified because the defendant did not act reasonably. The State cited the fact that the defendant had been trained as a police officer and "knows how to use deadly force, and what is not deadly force, specifically, with a baton."

The defense argued the victim made an aggressive move towards the defendant while his back was turned, and the defendant struck him with "a complete, instinctive reaction." The defense also claimed the victim was the aggressor because he approached the defendant. Additionally, the defense challenged causation, arguing that the injury to the victim did not affect the part of his brain that controlled "the most vital functions for lifesaving." The defense argued the killing was an "unfortunate accident."

In a prosecution for murder, the criminal agency of defendant as the cause of the victim's death must be established beyond a reasonable doubt. The Louisiana Supreme Court has held that "[i]t is not essential that the act of the defendant should have been the sole cause of the death; if it hastened the termination of life, or contributed, mediately or immediately, to the death, in a degree sufficient to be a clearly contributing cause, that is sufficient." **State v. Matthews**, 450 So.2d 644, 646 (La. 1984) (quoting **State v. Wilson**, 114 La. 398, 38 So. 397 (1905) (death from pneumonia caused by gunshot wound)).

Any rational trier of fact, viewing the evidence in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder, including that the defendant acted with the specific intent to kill or cause great bodily harm, rather than criminal negligence. The defendant's conduct was a substantial factor in bringing about the death of the victim, and the defendant's identity as the perpetrator of that offense against the victim was without question. Conflicting testimony was presented at trial concerning the actions of the victim and the defendant on the night of the incident and on the issue of the criminal agency of

the defendant as the cause of the victim's death. The jury heard all of that testimony and viewed all of the evidence presented at trial and, notwithstanding any alleged inconsistencies, found the defendant guilty of second degree murder. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness.

Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. The fact that the record contains evidence that conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient. See State v. Nixon, 2017-1582 (La. App. 1 Cir. 4/13/18), 250 So.3d 273, 291, writ denied, 2018-0770 (La. 11/14/18), 256 So.3d 290.

**Justifiable Homicide**

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21.

When self-defense is raised as an issue by the defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. The issue is whether a rational fact finder, viewing the evidence in

11

the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant did not kill the victim in self-defense. **State v. Patorno**, 2001-2585 (La. App. 1 Cir. 6/21/02), 822 So.2d 141, 147.

At trial, the defendant testified that he grew up in Puerto Rico and entered the police academy in 2003 or 2004. His training included personal defense. He had been trained in how to engage blocking techniques with a baton and was also familiar with a chart used in training, which showed different parts of the body in different colors. He indicated the green target areas were areas of minimal resulting trauma; the yellow target areas were areas of moderate to serious levels of resulting trauma; and the red target areas, which included the head, the heart, the spinal column, the neck, and the hollow behind the ear, were the highest areas of sustaining serious trauma. He stated he learned to strike the arms and legs first and "at no time" to strike in the red target area. He worked as a police officer for approximately eight years, until he was injured in a car accident. He had experience with how to deal with drunk people; and while he was a police officer, he had never killed a drunk person.

The defendant further claimed he left the bar after striking the defendant because Rivera was yelling at him to run because there were people with bottles, and he saw a man with a bottle. After leaving the bar, the defendant turned off his cell phone and went to his sister's house in Morgan City. Rivera acknowledged that she told the defendant to leave because she saw people grabbing pool cues and balls. Batista likewise claimed she and the defendant left because Rivera told them there were people there that "were going to hurt" them.

In finding the defendant guilty, the jury clearly rejected the claim of self-defense and concluded that the use of deadly force under the particular facts of this case was neither reasonable nor necessary. Based on the evidence, a juror could have reasonably concluded that the defendant, who had training in the use of lethal and

nonlethal self-defense, struck the heavily intoxicated, unarmed victim on the head with a pool cue with sufficient force to penetrate his skull and brain. A rational juror could have reasonably concluded that the killing was not necessary to save the defendant from the danger envisioned by La. R.S. 14:20(A)(1) and/or that the defendant had abandoned the role of defender and taken on the role of an aggressor and, as such, was not entitled to claim self-defense. **State v. Tran**, 98-2812 (La. App. 1 Cir. 11/5/99), 743 So.2d 1275, 1291, writ denied, 99-3380 (La. 5/26/00), 762 So.2d 1101; see La. R.S. 14:21.

Moreover, the verdict returned in this case indicates the jury was unpersuaded by the testimony that the defendant left the bar after the killing because he was afraid of mob violence. The defendant's actions in leaving the bar and failing to report the incident are inconsistent with a theory of self-defense. Flight following an offense reasonably raises the inference of a "guilty mind." See **State v. Captville**, 448 So.2d 676, 680 n.4 (La. 1984); **State v. Bland**, 2015-1662 (La. App. 1 Cir. 4/20/16), 194 So.3d 679, 686, writ denied, 2016-0920 (La. 4/24/17), 219 So.3d 1097. Accordingly, the jury's rejection of the defense of justifiable homicide is supported by the evidence.

In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See **Ordodi**, 946 So.2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). To otherwise accept a hypothesis of innocence that was not unreasonably rejected by the fact finder, a court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the

13

fundamental protection of due process of law.  <u>See</u> **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (per curiam).

For the above and foregoing reasons, we find no merit to the defendant's arguments on appeal and affirm his conviction and sentence.

**CONVICTION AND SENTENCE AFFIRMED.**