HIGGINBOTHAM, J.
*276 The defendant, Lamont James Nixon, Jr., was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1.[1] He pled not guilty and, following a jury trial, was found guilty as charged. The defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant now appeals, designating two counseled assignments of error and two pro se assignments of error.
FACTS
On the night of August 8, 2013, three men wearing masks entered Vincent Naquin's house on Louise Street in Houma. Vincent was home with some friends and his girlfriend, Krissan Fuselier, who was lying down in the bedroom with her and Vincent's young son. Sometime after 9:00 p.m., Krissan heard a lot of noise, got up to investigate, and found in the kitchen the three masked perpetrators and Vincent, with his hands raised. Krissan saw that two of the men had guns. One of the perpetrators, who had a gun, moved Krissan out of the kitchen and into the living room. While in the living room, Krissan heard the other two perpetrators in the kitchen, asking Vincent, "Where is the shit?" and "Where is the money?" The gunman with Krissan stood in the doorway between the kitchen and the living room and told Krissan that if they moved, he would blow off their heads. When one of the perpetrators in the kitchen appeared to be heading toward the back of the house where their son was, Vincent threw a punch and then moved out of her sight. Krissan then heard commotion in the kitchen and two gunshots. Krissan heard Vincent say "Oh, they shot me" and saw the three perpetrators run from the house. Krissan found Vincent on the floor, shot in the chest and bleeding. Vincent's friend called 911, but Vincent died before the police arrived. Vincent had surveillance cameras at his house. One of the cameras in the garage area captured the three perpetrators entering and leaving the house. The police seized this video footage as well as two .25 caliber spent cartridge cases from the scene.
When the three perpetrators ran from Vincent's house, they jumped over the fence in the backyard, then ran through the yard of a house on Leona Street that belonged to Douglas Phillips, III. Douglas grabbed his gun, went outside, and fired a warning shot into the dirt. Douglas witnessed the three perpetrators jump into a 1994 white Cadillac that was parked in his yard. He saw two of the perpetrators get in the back seat and one get in the front passenger side. As the driver drove away, *277 Douglas fired two shots at the car in an attempt to disable it.
During the investigation, the police learned that the Cadillac belonged to the defendant. Two days after Vincent was shot and killed, the police found the Cadillac, burned and abandoned. The car had been set on fire and left in a marshy area in Bayou Dularge, about six miles down Falgout Canal Road. The police found bullet holes in the car where Douglas had shot at and hit it, and a large cement block placed on the accelerator.
The day before Vincent was killed, the defendant and Kevone were hanging out at the mobile home of a friend, Trent Dehart. On that day, the defendant borrowed Trent's .25 caliber semi-automatic handgun. The defendant told Trent he needed the gun to go "hit a lick" (rob someone). The defendant left Trent's that night in his Cadillac with Trent's gun. The day after the killing, the defendant returned to Trent's mobile home. Trent, who had seen information on Facebook about a recent robbery and killing, asked the defendant about it. The defendant told Trent that he killed him and that he "ditched" the gun.
The day after the shooting, the defendant's girlfriend, Jasmine Westbrook, got off of work at about 4:00 p.m. and went to her great-grandmother's house. Jasmine and the defendant had plans to go bowling that night with their friends Keri Bourgeois and Abelardo Carbajal. Around 6:30, Keri picked up Jasmine from her great-grandmother's house, and when they were in the car, Keri told Jasmine that the defendant told her (Keri) that he had killed someone. When they arrived at Keri and Abelardo's house in Blue Bayou, the defendant was already there, but his Cadillac was not. When Jasmine entered the house, she saw the defendant and could tell that he had been crying. Jasmine and the defendant went in the back to the bedroom where the defendant told her that he had gone to the Vincent's house with a gun, ended up getting into a tussle with Vincent, and the gun went off. The defendant also told Jasmine the identities of the others involved, namely, Kevone, Jaabar, and Treyvance.
After the shooting, Detective Cary Bergeron, with the Houma Police Department received information about Treyvance's involvement in the shooting. According to Detective Bergeron, David Ogden and William Stevenson had learned through social media and gossip that they allegedly had some involvement in the incident. The two men spoke to Ulysses Stevenson, the brother of William Stevenson, whose name had also been "floating around." When Ulysses denied any involvement, the three men approached Treyvance because Ulysses heard Treyvance was involved. After they spoke to Treyvance, David went to the police and spoke to Detective Bergeron. According to Detective Bergeron, Treyvance told David that he was involved, along with Kevone and the defendant. Further, David told Detective Bergeron that Treyvance admitted he was at the scene, but said he parked on the next street and stayed in the car during the shooting. Treyvance told David that he did not know about the planned robbery and thought they were going to Vincent's house to buy marijuana. Treyvance stated to David that the defendant was the shooter, and he used a .25 caliber handgun. Further, according to David, Treyvance told him that when the others were running to the car, a "white male shot at the vehicle." Detective Bergeron indicated that when he later interviewed Trey vance, Treyvance's account of the incident was consistent with what David said Treyvance told him.
Detective Bergeron testified that Treyvance was brought to the police station by his mother and cousin. Based on what *278 Treyvance told Detective Bergeron, Treyvance was arrested for principal to second degree murder and armed robbery, and arrest warrants were issued for the defendant and Kevone. Detective Keith Craft, with the Houma Police Department, interviewed Treyvance several times and was told the same information that Treyvance provided to Detective Bergeron.
The defendant testified at trial. He denied that he shot Vincent. He stated that when Vincent was shot and killed, he was not there, and was at home.
COUNSELED ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant argues the trial court erred in granting the State's motion in limine to prevent him from introducing evidence regarding Herbert Watkins, who was a possible suspect early on in the investigation.
The issue here is the defense's attempt to interject the name Herbert into the proceedings so that the jury would have another possible suspect to consider, other than the defendant. In his opening statement, one of the defense attorneys, Gregory J. Sauzer, told the jury the following:
Well, Herbert Watkins called at one point before the murder of Vincent Naquin. Herbert Watkins spoke to Vincent Naquin and said, "Hey, you know, I hear you have some beef with my brother. I heard you wanted to beat my brother up." And I'm sure during the State's case, they're going to say it was nothing over $5. It's a little beef between people, and it was resolved.
The issue is the type of person Herbert Watkins is. Krissan Fuselier is going to testify to this. The evidence will show that he had recently just gotten out of jail. He was in jail for a murder charge, a murder charge in which the allegation was they burned the body, okay.
The prosecutor, S. Christopher Erny, filed a motion in limine the same day (as opening statements) and, after the testimony of one witness at trial, the motion in limine was taken up by the trial court. Erny set out in his written motion in limine that Herbert was a potential suspect in the very beginning of this case, but was shortly thereafter eliminated as a suspect. Erny also stated that the defense will seek to have witnesses testify that Hebert was previously arrested on a murder charge in a case where the body of the victim was burned. Erny then pointed out, "Herbert Watkins was never convicted of such a charge and the charges against him have long been dismissed." Erny argued in his motion that any of this information regarding Hebert was completely irrelevant and overly prejudicial. While the defendant's car was found burned in the instant matter, Erny noted that the defense would attempt to establish the similarities in burning evidence-that is, to use the arrest of Hebert to establish reasonable doubt in the defendant's case by suggesting Hebert is someone of bad character who commits murders and destroys evidence by burning.
At the motion in limine hearing, Erny pointed out that each of the other three people identified as suspects, and never eliminated as such, had either confessed to his involvement, pled guilty, or was found guilty at trial. According to Erny, the defense was now seeking to create a "false scenario" at trial to establish reasonable doubt. Erny further noted that while Hebert had been arrested at some point for a murder charge, the charge was dismissed. Erny stated: "He's never been convicted. There's no information about Mr. [Hebert] Watkins whatsoever." Erny then provided the following relevant argument:
*279 Anything from Krissan Fuselier would-her information would be solely hearsay, okay. She wouldn't have any direct or personal knowledge of Mr. [Hebert] Watkins being arrested. Anything she learned would have been learned from one or other individuals who may have heard. No telling how many chains of hearsay there.
Anything obtained from a police officer, either Detective Bergeron or Detective Craft, would probably be upon their personal knowledge.
But again, regardless of where the information is coming from, one, if it's hearsay, it needs to be excluded. Two, if it's not hearsay, based on the personal knowledge of one of the other witnesses, it needs to be excluded because, one, it's completely irrelevant. It's got no relevance. Two, even if it has a slight bit of relevance, it doesn't pass the 401, 403 balancing tests. In other words, the prejudicial effect to the State is overwhelming, and it's really forcing the jury to face a red herring.
The other defense counsel, Martin E. Regan, stated that Krissan, the victim's girlfriend quickly identified "at least three other people that she thought were involved or may have been involved." According to Regan, his client was not guilty and, as such, the defense theory of the case is that someone else was involved in the murder, namely, possibly, Hebert. When the trial court asked Regan about the relevance of one of these "phantom defendants" who had been accused of some other crime, Regan responded that the State was not without defenses. Regan continued:
Put Mr. [Hebert] Watkins on and say, "Yeah, I got arrested, but I really didn't do it, and they let me go. The case isn't resolved yet."
All I'm saying is that the person that loved him and lived with him at this point was aware of at least three other people she thought did it. Now the question is: Are they the kind of guys that commit murders? Well, the police suspected this man. He's got a probable cause, I'm sure, order to pick him up, arrest him based on the information they had. These are the kind of people that commit murders.
The trial court granted the State's motion in limine. The following exchange indicated the parameters of what would be allowed at trial:
The Court: Well, let's get to the nuts and bolts. Officer is on the stand. "Isn't it true that y' all had another suspect?" Answer: "Yes."
Erny: That's fine, and look, I don't have a problem with that as I've stated. They're going to ask Krissan, "Did you give names of some individuals who you thought it could be?" Yes, and she can-
The Court: Yes, that's permissible.
Erny: That's permissible all day long, okay. Now the fact is the next question that's going to come up. "Oh, isn't it true that Herbert Watkins was arrested, just got out of jail for a murder charge? Isn't that true?" Well, one, she wouldn't have that direct knowledge.
The Court: Okay, I got it. Okay, I'm not going to allow it.
Erny: Thank you.
The Court: Motion in limine granted.
The defendant argues that the exclusion of the evidence at issue resulted in a violation of his constitutional right to present a defense. Few rights are more fundamental than a defendant's right to present a defense. Chambers v. Mississippi , 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). In compelling circumstances, the defendant's right to present *280 his defense allows admission of hearsay evidence. See State v. Rubin , 2015-1753 (La. 11/6/15), 183 So.3d 490, 491 (per curiam). Constitutional guarantees, however, do not assure the defendant the right to admit any type of evidence-only that which is deemed trustworthy and has probative value. State v. Governor, 331 So.2d 443, 449 (La. 1976) ; State v. Wilson , 2015-1794 (La. App. 1st Cir. 4/26/17), 220 So.3d 35, 51.
Based on our careful review of the entire record, we find no reason to disturb the trial court's ruling on the State's motion in limine. The defendant, in being prohibited to allow a witness, Krissan in particular, to testify what she thought she knew about Herbert, did not prevent the defendant from presenting a defense. The fundamental right to present a defense does not require the trial court to admit irrelevant evidence or evidence with such little probative value that it is substantially outweighed by other legitimate considerations. State v. Coleman , 2014-0402 (La. 2/26/16), 188 So.3d 174, 197, cert. denied, --- U.S. ----, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016) ; see Holmes v. South Carolina , 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) ; State v. Mosby, 595 So.2d 1135, 1139 (La. 1992).
We note initially that anything Krissan would have testified about regarding what she might have heard about Hebert, namely that he had been charged with murder in some other case, would have constituted impermissible hearsay. Hearsay evidence is evidence of an out-of-court, unsworn, oral or written statement made by a person other than the testifying witness which is offered for the truth of its content. La. Code Evid. art. 801(C) ; State v. Veal , 583 So.2d 901, 903 (La. App. 1st Cir. 1991). As a general matter, under compelling circumstances a defendant's right to present a defense may require admission of statements which do not fall under any statutorily recognized exception to the hearsay rule. State v. Van Winkle , 94-0947 (La. 6/30/95), 658 So.2d 198, 202 ; State v. Gremillion , 542 So.2d 1074, 1078 (La. 1989). Normally inadmissible hearsay may be admitted if it is reliable, trustworthy, and relevant, and if to exclude it would compromise the defendant's right to present a defense. Van Winkle , 658 So.2d at 202 ; State v. Juniors , 2003-2425 (La. 6/29/05), 915 So.2d 291, 325-26, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006).
Krissan's testimony, particularly during cross-examination (discussed below), was fraught with bemusement and inconsistencies. In the instant case, the specific testimony sought to be admitted by the defendant, through Krissan, had no indicia of reliability or trustworthiness that would justify its admissibility in evidence as an exception to the well-settled rules of evidence.[2] See Juniors , 915 So.2d at 326.
*281 Based on her testimony, it was not clear that Krissan knew anything about Hebert or what he might have done (in some unconnected case). It was clear she picked up the name, as well as many others, based on the large volume of drug-dealing that her boyfriend, Vincent, engaged in. Krissan indicated in her testimony that, three weeks prior to Vincent being killed, Vincent had received a large supply of marijuana-about nine pounds, which, for him, was a typical amount. Vincent had a large number of "customers," according to Krissan, and was able to sell nine pounds in three weeks.
In addition to being inadmissible hearsay, the testimony by Krissan regarding what she had heard about Hebert would have been overly prejudicial and would have served only to confuse the jury. See La. Code Evid. art. 403. On direct examination, Krissan testified that she provided some names to the police as possible suspects, namely Ulysses and Hebert. When asked if there were any other names she thought might be a suspect, Krissan replied, "I don't think so. Oh, I'm sorry, there was one more, Rick which is, I believe which is Ulysses Stevenson's nickname." On cross-examination, Krissan testified she thought Hebert was Ulysses's brother.
Before we address more fully Krissan's cross-examination, we point out some relevant facts established at trial. Ulysses's brother is William Stevenson. Detective Bergeron interviewed Ulysses. Based on the information Ulysses gave Detective Bergeron, Ulysses was eliminated as a suspect and the detective's idea of who he thought the suspects were, was confirmed. Detective Bergeron also spoke to Treyvance, one of the actual implicated suspects who was later arrested for armed robbery and second degree murder.[3] Treyvance's statement to Detective Bergeron farther confirmed that Ulysses and William (and David) were no longer suspects. Krissan testified at trial that she thought Ulysses and Hebert were brothers. In his brief, the defendant states, "Herbert Watkins and Ulysses Stevenson are brothers." But there is nothing in the record before us that suggests that Hebert and Ulysses are brothers.
With the foregoing information, Krissan's testimony on cross-examination can be better understood. What her testimony revealed was that she was extraordinarily confused about who she thought the possible suspects were. We feel the only way to properly convey Krissan's bewilderment is to provide broad sections of the colloquy between Krissan and Regan (defense counsel). In the following colloquy, Regan tried to establish who Krissan identified as suspects:
Q. What I'd like to know is-let's talk about these guys. Did you give them more than three names possibly?
A. Yes, sir.
Q. Before we talk about these people, how many people did you suspect may have been involved in this robbery?
A. Three.
Q. Three?
A. (Nods head.)
Q. I know because you saw three. But obviously, you couldn't tell who they were; correct?
A. Correct.
Q. And was it the guy with the green mask on that did the shooting?
A. No, sir.
Q. Okay, so three people. My understanding, let me just make sure I'm *282 correct, you could not identify any of the people in the house?
A. No, sir.
* * * * *
Q. All right. Next question, there were two Stevenson brothers; right?
A. Yes, sir.
Q. And they are brothers?
A. I believe so, yes, sir.
Q. And how do you know these two guys?
A. I don't really know them. I just know of them. We met Herb at Blue Bayou one year when we took our son.
Q. You met him where, I'm sorry?
A. At Blue Bayou one year when we took our son there.
Q. Blue Bayou, okay, all right. And tell me about Rick. What do you know about Rick? Why did you suspect him?
A. Because he owed Vincent money and he, like he called his older brother which was Herb Watkins to bring him the money, and he brought it the next day.
Q. So who owed who money?
A. Ulysses owed Vincent money.
Q. Ulysses owed Vincent money?
A. Yes, sir.
Q. Okay. For what?
A. I'm actually not sure. If I had to guess, marijuana.
Q. Okay. Was it a drug deal?
A. If I had to guess. I'm not 100 percent sure.
Q. You think so?
A. Yes, sir.
Q. Okay. And how long had this debt been around at this point? How long had he had that debt?
A. I'm not 100 percent sure.
Q. That's okay if you're not 100 percent. Had it been for several months or months or what?
A. I honestly have no idea.
Q. Well, tell us how you knew there was a debt here to begin with. How did you know that?
A. Because I heard him on the phone.
Q. Who?
A. Vincent.
Q. Vincent's on the phone. You heard him on the phone?
A. Uh-huh.
Q. And you got the sense of what, what was going on?
A. That he was mad that-
* * * * *
Q. And did you get the sense that there was some bitterness between them?
A. Yes, sir.
Q. And again, I'm not trying to go anywhere I can't. But you threw his name out at this point because there may have been a beef between them that would have caused them to come over and do this; right?
A. I ...
Q. I'm sorry? I mean common sense; right? Let me start back where we started.
A. I just don't think that the beef was that big to where they would want to come over and try to kill him.
Q. You said that-I'm sorry?
A. I just don't think that the beef was that big to where he would want to come over and try to kill him or try to rob us.
Q. See, that, I need you to explain because you told the police that you thought three guys came over, and you thought that these were the guys that would do it. Something must have told *283 you that they should be suspects and investigated; right? Am I right?
A. Yes, sir.
Q. Okay. So, which Stevenson was that we're talking about now, Ulysses or Rick?
A. I'm so confused right now, I'm sorry.
* * * * *
Q. The way you said it, Rick or Ulysses, what's the other brother's name?
A. Herb.
Q. Herb. What's Herb's last name?
A. Watkins.
Q. Okay. How many men were you referring to when you said the Stevensons?
Mr. Erny: Your Honor, again-
Mr. Regan: One or two?
Mr. Erny:-he said the Stevensons. That's another-object to the form-
The Witness: Yeah, I don't ever remember saying the Stevensons.
The Court: Wait, wait.
Mr. Erny: I'm objecting to the form of the question.
The Court: Sustained.
Mr. Erny: It's completely improper.
By Mr. Regan:
Q. Okay, let me go back. Did you give the police three names?
A. Yes, sir.
Q. Yes, you did. I'm not trying to confuse you or anybody. What three names did you give to the police? Were there three individuals or just two guys, one named Herb Watkins and another Stevenson with two different names?
A. Sir, honestly, I don't know. I was, I mean, I was distraught that night. I mean I gave them those three names, but I didn't know if Rick-I still don't even know if Rick and Ulysses are the same person. I have no idea.
Q. That's fair. So when the district attorney suggests to you that I'm confusing you, you're confused to start with; right? Did you, in fact, give three separate names to the police?
A. Yes, sir.
Q. Okay. Now that's all. And then you didn't just pick these names out of a Cracker Jack box. You gave them those names for a reason, and I want to know, I'd like you to tell the jury why you suspected those people of being involved in the murder of Vincent. And I'll go to the Stevensons first. What had-you said there was money owed; right?
A. Yes, sir.
Q. Okay. How many Stevensons did Vincent deal with?
A. I didn't really know his clientele. I just, I mean, I knew some of them, but I'm not sure.
Q. Okay, all right. How many people did Vincent have trouble with?
Let's start with that.
A. None, other than ...
Q. I'm sorry?
A. No one really other than them.
Q. No one?
A. I mean there was like two people that he had problems with, but he was really well liked other than that.
Q. Okay. Now let's go to people that he was having problems with. Will you help me with that?
A. Yes, sir.
Q. All right. Now you talked about a phone call you overheard; right?
A. Uh-huh, yes, sir.
Q. How close was that in proximity to Vincent's death?
A. Maybe, maybe two weeks, a week. I'm not sure, sir.
Q. But it came to mind at that point?
*284 A. Yes, sir.
Q. And did you think that it might turn violent based on the conversation you overheard?
A. Not at the time, no, sir.
Q. I'm sorry?
A. Not at the time, no, sir.
Q. No, all right. Then there's another individual out there, at least one?
A. Uh-huh.
Q. Are you sure it's just two, two people, or did you give names of three individuals?
A. Sir, that was like three years ago. I have no idea.
At this point, Regan asked the trial court if Krissan could read her statement. A recess was taken, Krissan read the agreed-upon statement she made to the police, and the trial resumed. The following exchange then took place between Regan and Krissan:
Q. Ms. Fuselier, just trying to be clear, did you get a chance to read your statement?
A. Yes, sir.
* * * * *
Q. You're good? Fair enough. Now let's go back to this. This was the statement that was given at 11:18 in the morning on August 9th at this point. Do you remember Lieutenant Dana Coleman being there?
A. Yes, sir.
* * * * *
Q. Fair enough. So Detective Bergeron, Lieutenant Coleman, Detective Cadiere, all these people were there?
A. Yes, sir.
Q. Fair enough. Now as I understand it, and I'll just go back here, you had told them at this point because they were asking you who you suspected were the men that came in; right?
A. Uh-huh, yes, sir.
Q. Okay. And after reading this, did you see where you indicated that there were two Stevensons?
A. Yes, sir.
Q. Okay. That's what-and you didn't remember that, I think, when I was talking to you before; right?
A. No, I understood what you were saying. And I just, like I said before, I didn't know that they were two separate people.
Q. Okay. So what name would you give to the Stevenson, I guess-listen, I don't-I think we got it cleared up. So you basically only gave the names of two people, but one guy had two different names; is that it?
A. Yes, sir.
Q. Fair enough, fair enough. And we got as far as deciding or talking about why you suspected one of these guys?
A. Uh-huh.
Q. And you were talking about there being a money issue?
A. Yes, sir.
Q. Which one were you referring to?
A. Ulysses.
Q. I'm sorry?
A. Ulysses.
On redirect examination, Erny recalled the "beef" Krissan had testified about that Vincent may have had with one of these individuals. He asked if she remembered the amount that it was over. Krissan replied, "It was like $5."
The testimony of Krissan convinces us that anything to which she might have testified regarding her knowledge of Herbert would have constituted impermissible hearsay. Further, the testimony reveals, any information about Hebert, predicated on Krissan's knowledge of him, was irrelevant. And even if some semblance of relevance *285 were found, the probative value of such evidence would have been substantially outweighed by the danger of unfair prejudice and confusion of the issues. See La. Code Evid. art. 403.
We note as well that the defendant testified at trial. With his own testimony, he presented his alibi, namely, that he had been at home when Vincent was shot and killed. Cf. State v. Corley , 97-235 (La. App. 3rd Cir. 10/8/97), 703 So.2d 653, 663, writ denied, 97-2845 (La. 3/13/98), 712 So.2d 875 (where the court found the defendant was not prevented from asserting a defense because of the trial court's exclusion of the evidence; but rather, he chose not to present that defense by refusing to testify).Cf. State v. Martin , 582 So.2d 306, 315-16 (La. App. 1st Cir.), writ denied, 588 So.2d 113 (La. 1991) (holding that the exclusion of testimony did not violate the defendants' right to present a defense where the defendants testified as to their version of the events.) The unanimous guilty verdict was a rejection of the defendant's theory of innocence. See State v. Captville , 448 So.2d 676, 680 (La. 1984).
Moreover, the evidence clearly established the defendant's guilt. Thus, even if, arguendo , it was error for the trial court to grant the State's motion in limine, the defendant's substantial rights were not affected and, therefore, any such trial error would not have provided grounds for reversal of the defendant's conviction and sentence. La. Code Crim. P. art. 921 ; Sullivan v. Louisiana , 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ; State v. Johnson , 94-1379 (La. 11/27/95), 664 So.2d 94, 101-02. See Juniors , 915 So.2d at 331-32.
Constitutional guarantees do not require the admission of statutorily inadmissible evidence where a defendant's ability to put on a defense has not been impaired. Further, constitutional guarantees do not require the admission of evidence that is not trustworthy or lacks probative value. See State v. McBride , 2000-00422 (La. App. 3rd Cir. 11/15/00), 773 So.2d 849, 858-59, writ denied, 2001-0294 (La. 2/8/02), 807 So.2d 858 ; Corley , 703 So.2d at 663. Accordingly, we find the trial court did not err in granting the State's motion in limine to limit testimony regarding Herbert. See McBride , 773 So.2d at 861. We also find that the defendant was not deprived of the opportunity to present a defense.
The trial court's evidentiary ruling did not undermine the reliability of the jury's verdict in this case and, as such, this counseled assignment of error is without merit.
COUNSELED ASSIGNMENT OF ERROR NO. 2
In his second counseled assignment of error, the defendant argues that the trial court erred in denying his motion for mistrial and in refusing to admonish the jury. The defendant argues in brief that the State made several references to his failure to put on evidence to prove his innocence, "thereby shifting the burden of proof" from the State to prove guilt to the defendant to prove innocence. Following are the complained of comments by the prosecutor (Erny) during rebuttal closing argument:
He said you didn't hear evidence about, you know, chasing these other people down. Well, the investigation leads this way. He could have asked those questions. He didn't ask Officer Bergeron or Officer Craft any of those questions.
* * * * *
Maybe, maybe [David] threatened [Treyvance]. "Hey, you better do that." Did you hear any evidence of that? They could have called [David] on the stand."
*286 Later, the following exchange took place:
I didn't ask Lamont Nixon about the gun, about the car. No, I didn't. I didn't. Because when the burden of proof, when I put forth enough evidence for the burden of proof, then guess what? It shifts to the defendant, and they can put on a case. That's why they can call witnesses. That's why they have the ability to issue subpoenas free of charge.
Mr. Sauzer: Objection, Your Honor. May we approach?
(A bench conference was held.)
Mr. Erny: Like I was saying, the burden of proof is two parts, the burden of producing evidence and the burden of persuasion, okay. And if you have, in your minds during the course of this trial have had sufficient evidence to satisfy your minds that, "Oh, yeah, yeah, I think the State proved enough evidence. There's no doubt in my mind," then guess what, you know, they have the ability to put forth evidence to counteract anything we did.
Mr. Regan: Note my objection, Your Honor.
Mr. Erny: They put forth one witness.
Mr. Regan: Again, there's an objection.
Mr. Erny: One witness they put forth. They didn't call David Ogden.
They didn't call [Kevone] Cook or [Jaabar] Celestine.
Mr. Regan: It's an ongoing objection, Your Honor.
The Court: Yes, sir.
Mr. Erny: They didn't call anybody. They didn't call an alibi witness. The only thing Mr. Nixon did is "I didn't do it." Never gave an explanation for his vehicle. There's some innuendo about maybe he lent it out to somebody. Did you hear anything about that? No, zero, nada.
The defendant moved for a mistrial, averring that the State improperly argued that the defendant failed to call witnesses or put on evidence. If denied, the defendant asked that the jury be admonished. The trial court denied both motions. The defendant moved for the mistrial after the trial court charged the jury with the law.
La. Code Crim. P. art. 770 governs mistrials on the basis of prejudicial remarks and provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
None of the remarks by the prosecutor fall under La. Code Crim. P. art. 770.
The applicable law, therefore is in La. Code Crim. P. art. 771, which provides in pertinent part:
In the following cases, upon the request of the defendant or the state, the court *287 shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770 [.]
A mistrial under the provisions of La. Code Crim. P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Tran , 98-2812 (La. App. 1st Cir. 11/5/99), 743 So.2d 1275, 1280, writ denied, 99-3380 (La. 5/26/00), 762 So.2d 1101. A mistrial is warranted when certain remarks are considered so prejudicial and potentially damaging to the defendant's rights that even a jury admonition could not provide a cure. State v. Edwards , 97-1797 (La. 7/2/99), 750 So.2d 893, 906, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). Mistrial is a drastic remedy that is authorized only where substantial prejudice will otherwise result to the accused. State v. Anderson , 2000-1737 (La. App. 1st Cir. 3/28/01), 784 So.2d 666, 682, writ denied, 2001-1558 (La. 4/19/02), 813 So.2d 421. A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion. State v. Givens , 99-3518 (La. 1/17/01), 776 So.2d 443, 454 ; State v. Johnson , 2006-1235 (La. App. 1st Cir. 12/28/06), 951 So.2d 294, 300.
Closing arguments in criminal cases should be restricted to the evidence admitted, to the lack of evidence, to conclusions of fact that may be drawn therefrom, and to the law applicable to the case. Further, the State's rebuttal shall be confined to answering the argument of the defendant. See La. Code Crim. P. art. 774. Prosecutors are allowed wide latitude in choosing closing argument tactics. State v. Draughn , 2005-1825 (La. 1/17/07), 950 So.2d 583, 614, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). The trial judge has broad discretion in controlling the scope of closing arguments, and this court will not reverse a conviction on the basis of improper closing argument unless thoroughly convinced that the remarks influenced the jury and contributed to the verdict. State v. Vansant , 2014-1705 (La. App. 1st Cir. 4/24/15), 170 So.3d 1059, 1063 ; State v. Prestridge , 399 So.2d 564, 580 (La. 1981).
In denying the motion for mistrial and for an admonition to the jury, the trial court stated in pertinent part:
It seems to me that pursuant to Louisiana Code of Criminal Procedure Article 770 through and including 774, 775, it's clear to me that, No. 1, Mr. Erny did not comment on the defendant's failure to testily obviously because the defendant did testify. And there's no prohibition from commenting on the defendant responding to any witness.
And No. 3, I instructed the jury in voir dire and in my preliminary instructions and in my charge that the defendant does not have to put on any proof, that the burden is always on the State, etcetera, etcetera.
And I quote, "Mr. Nixon is not required to prove his innocence or to offer any proof relating to his innocence. It's up to the State to prove beyond a reasonable doubt every element of each charged offense. This burden stays with the State from start to finish." Okay, so I-the jury has been given that part many times; so I don't think we need to beat a dead horse.
*288 I see no reason to at this time tell them anything other than what they've already been told.
In this matter, there is no reason to disturb the trial court's denial of the motion for mistrial or its decision to not admonish the jury. The prosecutor, Erny, in his rebuttal closing argument did not shift the burden of proof to the defendant, as alleged. In pointing out the defendant's lack of evidence, Erny was merely responding to defense counsel's (Sauzer) closing argument, wherein throughout his closing, he referenced the State's lack of evidence and the witnesses that it could have called, but failed to do so. Following are the various remarks by Sauzer regarding the State's failure to call witnesses:
¦ The other individuals in the house weren't called;
¦ Well, who's to say that David Ogden wasn't providing this information because David Ogden himself was present? We don't know. The State never called Mr. Ogden to testify;
¦ [Erny] brought up the fact that Kevon [sic] Cook has pled guilty. And he asked Mr. Nixon the question, 'Why didn't you call Kevon [sic] Cook?' The same very question could be asked of the State, 'Why didn't you call Kevon [sic] Cook?';
¦ But who didn't we hear from here? We didn't hear from the lynchpin.... Mr. [Treyvance] wasn't called. He's the one with all the information. He's the one that puts everybody here;
¦ [A]nd those individuals ... include Keri Bourgeois, you didn't hear from her. She could have confirmed everything that happened at the residence that evening with Jasmine and Lamont;
¦ You didn't hear from Mr. Carbajal, Mr. Nixon's best friend. He didn't testify.
In State v. Uloho , 2004-55 (La. App. 5th Cir. 5/26/04), 875 So.2d 918, 927-28, writs denied, 2004-1640 (La. 11/19/04), 888 So.2d 192, 2008-2370 (La. 1/30/09), 999 So.2d 753, when defense counsel in closing argument found it "astonishing" that no police officer who was on the scene was called to testify to corroborate a deputy's testimony, the prosecutor in rebuttal stated that the defendant had the same subpoena power as the State had. In affirming the trial court's overruling of the defendant's objections, the Fifth Circuit found that the defense invited the jury in closing arguments to disbelieve the witnesses the State called to testify because the State did not call other witnesses to corroborate their testimony. See Vansant , 170 So.3d at 1064. See also State v. Williams , 2014-40 (La. App. 5th Cir. 9/24/14), 151 So.3d 79, 82-85, writ denied, 2014-2250 (La. 6/19/15), 172 So.3d 649.
Similarly in the instant matter, Sauzer in closing argument contended that the State could have called several witnesses to corroborate the State's theory that the defendant was involved in the robbery and killing of Vincent. In rebuttal, Erny pointed out that the defense could just as easily have called these and other witnesses had it chosen to do so. In this context, Erny's remark that when the State proved its case the burden of proof shifted to the defendant to "put on a case," was simply the emphasizing of his point that the State's evidence was unrebutted, and there were witnesses other than the defendant who could have testified on behalf of the defense but did not do so. See State v. Bridgewater , 2000-1529 (La. 1/15/02), 823 So.2d 877, 899, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003) ; State v. Smith , 433 So.2d 688, 696-698 (La. 1983)
Moreover, the trial court in the instant matter instructed the jury following *289 closing arguments that the defendant was presumed innocent, he was not required to prove his innocence. The trial court also stated: "It's up to the State to prove beyond a reasonable doubt every element of each charged offense. This burden stays with the State from start to finish." The trial court further instructed that opening statements and closing arguments were not evidence. Much credit should be accorded to the good sense and fairmindedness of jurors who have seen the evidence and heard the argument, and have been instructed by the trial judge that arguments of counsel are not evidence. Vansant , 170 So.3d at 1064-65. See State v. Mitchell , 94-2078 (La. 5/21/96), 674 So.2d 250, 258, cert. denied, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996).
The comments by the prosecutor were little more than a direct response to defense counsel's tactic in closing argument to suggest that the State had failed to prove its case by not calling witnesses it could or should have. See Williams , 151 So.3d at 85. See also State v. Kyles , 513 So.2d 265, 272-73 (La. 1987), cert. denied, 486 U.S. 1027, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988). Further, we find that even if the statement of the prosecutor in closing argument that the burden of proof "shifts' to the defendant was in error, this error is harmless because as we pointed out, the trial judge, in his closing instruction properly instructed the jury that the "burden stays with the state from start to finish" and that there is no shifting of the burden because "[i]t is up to the state to prove beyond a reasonable doubt every element of each charged offense." The prosecutor's remarks in rebuttal clearly did not contribute to the verdict nor make it impossible for the defendant to obtain a fair trial. See La. Code Crim. P. art. 775 ; Vansant , 170 So.3d at 1064.
Based on the foregoing we find no abuse of discretion in the trial court's denial of the defendant's motion for a mistrial or his request for an admonition.
This assignment of error is without merit.
PRO SE ASSIGNMENT OF ERROR NO. 1
In his first pro se assignment of error, the defendant argues the evidence was insufficient to support his conviction. Specifically, the defendant contends the State failed to prove his identity as the shooter (or that he was present at the time of the shooting).
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV ; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B) ; State v. Ordodi , 2006-0207 (La. 11/29/06), 946 So.2d 654, 660 ; State v. Mussall , 523 So.2d 1305, 1308-09 (La. 1988). The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno , 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. Furthermore, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required *290 to negate any reasonable probability of misidentification. Positive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibility of the witnesses, and this court will generally not second-guess those determinations. State v. Hughes , 2005-0992 (La. 11/29/06), 943 So.2d 1047, 1051 ; State v. Davis , 2001-3033 (La. App. 1st Cir. 6/21/02), 822 So.2d 161, 163-64.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. See La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. State v. Cousan, 94-2503 (La. 11/25/96), 684 So.2d 382, 390. Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. State v. Graham, 420 So.2d 1126, 1127 (La. 1982). The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. State v. McCue, 484 So.2d 889, 892 (La. App. 1st Cir. 1986).
The parties to crimes are classified as principals and accessories after the fact. La. R.S. 14:23. Principals are all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime. La. R.S. 14:24. Only those persons who knowingly participate in the planning or execution of a crime are principals. An individual may be convicted as a principal only for those crimes for which he personally has the requisite mental state. State v. Pierre , 93-0893 (La. 2/3/94), 631 So.2d 427, 428 (per curiam). The State may prove a defendant guilty by showing that he served as a principal to the crime by aiding and abetting another. State v. Huey , 2013-1227 (La. App. 1st Cir. 2/18/14), 142 So.3d 27, 30, writ denied, 2014-0535 (La. 10/3/14), 149 So.3d 795, cert. denied, --- U.S. ----, 135 S.Ct. 1507, 191 L.Ed.2d 443 (2015).
The defendant suggests in brief that the State failed to prove he was one of the perpetrators at the scene when Vincent was killed because all witnesses who identified him as the perpetrator were not present at the time of the crime. The only "eyewitness," according to the defendant was Krissan, and Krissan never identified him as a suspect. As such, the defendant avers, Krissan was the only witness "to successfully pass all five" factors under the identification test set out in Manson v. Brathwaite .[4]
Based on the testimonial evidence at trial, at least four people indicated that, not only was the defendant present at the scene, but that he was the one who shot *291 Vincent. The defendant's friend, Trent, testified that the defendant borrowed his .25 caliber semi-automatic handgun the day before Vincent was killed. The defendant told Trent he needed the gun to go "hit a lick." The day after the killing, the defendant went to Trent's mobile home and told Trent that he had "killed him." The defendant also said that he "ditched" the gun. The two cartridge cases found at the scene of the shooting were FC .25 auto cases. Vincent was killed by a single gunshot to his chest. It appears the other bullet fired lodged in the dining room floor. Ballistics testing indicated that both cartridge cases were fired from the same gun, and that the bullet was most consistent with a .25 auto caliber.
The defendant's girlfriend at the time of the incident, Jasmine, testified at trial that her friend, Keri, told Jasmine that the defendant had told Keri that he had killed someone. Shortly thereafter, when Jasmine spoke to the defendant personally, the defendant told her he had gone to the house with a gun, got into a tussle, and the gun went off. The defendant also told Jasmine the identities of the other three individuals involved.
According to both Detective Bergeron and Detective Craft, Treyvance implicated himself and the defendant in their involvement in the incident, and Treyvance said that the defendant shot Vincent with a .25 caliber handgun.
The argument regarding sufficiency set forth by the defendant is based on credibility determinations. The jury chose to believe the witnesses who identified the defendant as the shooter rather than the defendant's own version of the events. Moreover, the jury might have determined that Krissan's confused testimony did not establish one way or the other whether the defendant was at the house when Vincent was shot and killed. In any event, the jury heard all of the testimony and viewed all of the evidence presented to it at trial and found the defendant guilty as charged. When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. Captville , 448 So.2d at 680. It is clear from the guilty verdict that the jury rejected the defendant's theory of misidentification.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. State v. Taylor , 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See State v. Mitchell , 99-3342 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn , 479 So.2d 592, 596 (La. App. 1st Cir. 1985). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins , 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).
*292 Based on the foregoing, the jury could have reasonably concluded that the State proved the defendant's identity as the person who shot and killed Vincent, or that the defendant was in the house when Vincent was killed. After a thorough review of the record, we find the evidence clearly negates any reasonable probability of misidentification and supports the jury's unanimous guilty verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of second degree murder. See State v. Calloway , 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).
This pro se assignment of error is without merit.
PRO SE ASSIGNMENT OF ERROR NO. 2
In his second pro se assignment of error, the defendant argues the trial court erred in granting the State's motion in limine to prevent the defendant from introducing evidence concerning Herbert.
We addressed this issue fully and found it meritless in the first counseled assignment of error.
This pro se assignment of error is without merit.
CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.

Three co-defendants in this case were Jaabar Celestine, Kevone Cook, and Treyvance Fanguy. Jaabar was convicted of second degree murder; he appealed his conviction and sentence, which were affirmed by this court. See State v. Celestine , 2017-0381 (La. App. 1st Cir. 11/1/17), 2017 WL 4976539 (unpublished). Kevone pled guilty to manslaughter. By the conclusion of the instant trial, Treyvance had not yet gone to trial.

The complained of testimony not admitted into evidence arose during the cross-examination of Krissan. The first instance was the following:
Q. Okay. And as I understand it at this point, there is some reason that you thought it may involve other people. So what I'd like you to do is tell the jury why you thought that Mr. Watkins may have been one of the perpetrators. What was it that told you that maybe he was one of them?
The prosecutor objected to the question, and the objection was sustained. Later during Krissan's cross-examination, the following exchange took place:
Q. Okay. And then there was a second individual?
A. Yes, sir.
Q. Why were you suspecting him as being one of the perpetrators?
Erny: Your Honor, objection.
The Court: Objection is?
Erny: Well, motion in limine.
The Court: Okay, sustained.

Treyvance said he stayed in the car during the robbery and killing.

In his brief, the defendant addresses the five-factor test in determining the reliability of identification of a suspect discussed in Manson v. Brathwaite , 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) and Neil v. B iggers , 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The defendant's reliance on these Supreme Court decisions is misplaced. These decisions are concerned with the admissibility, not the sufficiency, of identification testimony. Once the identification testimony is introduced into evidence, as in the instant matter, a Biggers or Brathwaite analysis becomes irrelevant. The defendant failed to file a motion to suppress the identification of the defendant, so the issue of the admissibility of such evidence is not before us. See State v. White , 2016-0611 (La. App. 1st Cir. 10/28/16), 206 So.3d 387, 390-91.