NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2019 KA 0408

STATE OF LOUISIANA

VERSUS

ROMAN TROSCLAIR

Judgment rendered: DEC 2 7 2019

* * * * *

On Appeal from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
No. 09-12-0701, Sec. III

The Honorable Michael R. Erwin, Judge Presiding

* * * * *

| | |
|---|---|
| Hillar C. Moore, III<br>District Attorney<br>Dylan C. Alge<br>Assistant District Attorney<br>Baton Rouge, Louisiana | Attorneys for Appellee<br>State of Louisiana |
| | |
| Karl J. Koch<br>Baton Rouge, Louisiana | Attorney for Defendant/Appellant<br>Roman Trosclair |

* * * * *

BEFORE: McCLENDON, WELCH, AND HOLDRIDGE, JJ.

**HOLDRIDGE, J.**

The defendant, Roman Trosclair, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1 (count 1); and attempted second degree murder, a violation of La. R.S. 14:27 and 14:30.1 (count 2). He pled not guilty and, following a jury trial, was found guilty as charged on both counts. The defendant filed a motion for postverdict judgment of acquittal and/or new trial, which was denied. For the second degree murder conviction, the defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence; for the attempted second degree murder conviction, he was sentenced to fifty years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The sentences were ordered to run consecutively. The defendant now appeals, designating one assignment of error. We affirm the convictions and sentence on count 2. We amend the sentence on count 1 (second degree murder) to include that it be served at hard labor, and affirm as amended.

## FACTS

On the night of May 14, 2012, Joshua Mumphrey was at his apartment on North Sherwood Forest Drive. He was getting ready to go to a club with some people, including his sister Cassandra and his friend, Dedrick Droze. Dedrick was the father of Cassandra's child. Dedrick left the apartment alone in Cassandra's car, a white four-door Oldsmobile Ciera. Dedrick returned to the apartment several hours later with a man he knew, but whom no one else in the apartment knew. The unknown man was later identified as the defendant.

Joshua, Dedrick, and the defendant left the apartment together. Joshua drove, Dedrick was in the front seat, and the defendant was in the passenger-side of the back seat. Before going to the club, they stopped to pick up marijuana at

2

one house and sell it at another house in the Glen Oaks area. They stopped at Z Food Mart to buy alcohol. It is not clear, based on Joshua's testimony at trial, whether or not a drug transaction was conducted. According to Joshua, they drove to several houses in the Glen Oaks area. They stopped at one particular house where Dedrick picked up a handgun.

With all three back in the car, the defendant at some point took the gun from Dedrick and told Joshua to pull into a yard. As Joshua tried to put the car in reverse, the defendant shot Joshua in the head. Joshua jumped to the back seat and began fighting the defendant. The defendant shot Dedrick in the back of the head, killing him. The defendant shot Joshua again, in the arm. The defendant got out of the car, and Joshua moved to the driver's seat to try to drive away. The car drove in reverse until it backed into a utility pole (trunk first). Joshua left the car and ran to some houses until someone finally helped him. He was transported by ambulance to Our Lady of the Lake Hospital. The shooting likely occurred sometime between 10:00 p.m. and 11:00 p.m.

Lieutenant Rob Chambers, with the East Baton Rouge Parish Sheriff's Office, investigated the case to determine who shot Joshua and Dedrick. He obtained Dedrick's phone records and found that a number that had been called on Dedrick's phone the night of the shooting was on the subscriber account of Kendall Callaghan.[1] Lieutenant Chambers compiled a six-person photographic lineup, which contained Kendall's picture. Joshua picked out Kendall in the lineup. Cassandra, and a boy who was at the apartment that night (with Joshua and Cassandra), also identified Kendall as the person they had seen in the apartment.

Lieutenant Chambers arrested Kendall and questioned him. Kendall's home was searched and nothing was found. According to his testimony at trial, Kendall

---

[1] Kendall is referred to as "Callaghan" throughout most of the record, but occasionally is referred to as "Calligan."

did not know Joshua or Dedrick, had never been to Z Food Mart, and he had never been to Joshua's apartment. Kendall explained that he had two phones on his account, one of which he had given to his (then) girlfriend; so if she had called Dedrick, that call would have shown up on Kendall's account as the subscriber. Kendall also testified that he did not make the call in question and knew nothing about it. Lieutenant Chambers determined he had the wrong suspect and released Kendall.

Having learned that the shooter, Joshua, and Dedrick had all gone to Z Food Mart together, Lieutenant Chambers obtained video footage from the store. A still photograph of the then-unidentified person was created from the video and shown on television. Two people called in, identifying the person as the defendant. Joshua testified that he recognized the defendant as the person who shot him when he saw his picture on television. Joshua identified the defendant as his shooter in open court. Several DNA samples were taken from the white car. The defendant's DNA was found on the exterior rear passenger-door handle.

The defendant did not testify at trial.

## ASSIGNMENT OF ERROR

In his sole assignment of error, the defendant argues the evidence was insufficient to support the convictions. Specifically, the defendant contends that his identity as the perpetrator was not established by the State.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789,

61 L.Ed.2d 560 (1979). See La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See **State v. Patorno**, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. Furthermore, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27(A).

In order for an accused to be guilty of attempted murder, a specific intent to kill must be proven beyond a reasonable doubt. Although a specific intent to inflict great bodily harm may support a conviction of murder, the specific intent to inflict great bodily harm will not support a conviction of attempted murder. **State v. Woods**, 2000-2147 (La. App. 1st Cir. 5/11/01), 787 So.2d 1083, 1095, writ denied, 2001-2389 (La. 6/14/02), 817 So.2d 1153. See **State v. Butler**, 322 So.2d 189, 192-93 (La. 1975).

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to

5

follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. **State v. Cousan**, 94-2503 (La. 11/25/96), 684 So.2d 382, 390. Specific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction. **State v. Broaden**, 99-2124 (La. 2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. **State v. Nixon**, 2017-1582 (La. App. 1st Cir. 4/13/18), 250 So.3d 273, 290, writ denied, 2018-0770 (La. 11/14/18), 256 So.3d 290. Deliberately pointing and firing a deadly weapon at close range indicates specific intent to kill. See **State v. Robinson**, 2002-1869 (La. 4/14/04), 874 So.2d 66, 74, cert. denied, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004).

The defendant argues in brief that Joshua lacked credibility in his identification of him (the defendant) as the shooter. The defendant points out that Joshua initially identified someone other than him as the person who shot Joshua and Dedrick. Joshua, Cassandra, and a boy who was also at the apartment, identified Kendall as the person they saw at Joshua's apartment the night of the shootings before they went out. Joshua changed his mind, according to the defendant, only after he saw a picture of the defendant on television on CrimeStoppers.

The defendant also avers that the video of Z Food Mart shown to the jury did not establish that the three men - the defendant, Joshua, and Dedrick - were together. Since the vehicle was not seen in the video, there was nothing to establish the three men got out of or into the same white vehicle.

The defendant notes that Joshua had prior felony convictions for possession of cocaine, simple burglary, and aggravated incest. The defendant further points

out the inconsistencies in Joshua's testimony. For example, Joshua testified at one point that he (Joshua) had the marijuana and they were going to make a sale that evening. Later, however, Joshua testified they were driving to a house to pick up the marijuana in order to sell it.

Finally, according to the defendant, the DNA evidence did not prove he was in the vehicle at the time of the shooting. The evidence in fact, the defendant suggests, tended to prove he was not in the vehicle during the attack. The defendant notes that despite Joshua's testimony regarding all of his (the defendant's) alleged movement inside the vehicle, his DNA was not found at other locations inside the vehicle.

All of the foregoing lack of forensic evidence and/or testimonial inconsistencies pointed out by the defendant in brief was brought out at trial and argued by defense counsel. Despite this, however, the jury chose to believe the eyewitness testimony of Joshua. Positive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. **State v. Hughes**, 2005-0992 (La. 11/29/06), 943 So.2d 1047, 1051. See **State v. Davis**, 2001-3033 (La. App. 1st Cir. 6/21/02), 822 So.2d 161, 163-64.

Moreover, despite the defendant's assertions, the State presented evidence that corroborated that it was the defendant who was with Joshua and Dedrick the night they were shot. Joshua testified that he did not know the defendant and had never seen him before, prior to Dedrick showing up with the defendant at Joshua's apartment on the night of the shooting. Joshua identified Kendall in the photographic lineup he was shown by Lieutenant Chambers. This identification was done at 2:41 a.m. in the hospital, two days after Joshua had been shot. Even at

7

this time, Joshua was not certain about Kendall as the shooter. Joshua testified that after picking him out, he said, "Look, this looks like the dude, but I don't know if that's him." Joshua testified that when he saw the defendant's picture on television, he told his girlfriend that that was the guy who shot him. On direct examination, Joshua was asked if he was absolutely certain that it was the defendant who shot him. Joshua replied, "I'm positive." When asked on redirect examination if he had any doubt whatsoever that the defendant was the person who shot him and Dedrick, Joshua replied, "No doubt."

Joshua also identified the defendant in Z Food Mart video footage. The video was played for the jury, and Joshua pointed out himself, Dedrick, and the defendant at that store together on the night of the shooting. Reviewing the video footage, Joshua testified that he was wearing a white T-shirt, Dedrick was wearing an orange shirt, and the defendant was wearing a black tank top. Joshua then indicated that all three left the store, got back in the vehicle, and drove to a house to get marijuana. Joshua indicated he was certain it was the defendant who was in the vehicle with him and Dedrick, and that there was no one else in the vehicle. Joshua also testified that when he picked out Kendall in the photo lineup, he had told Lieutenant Chambers that the guy who shot him had gone to the store with him earlier.

Lieutenant Chambers testified that after speaking with Kendall, he was able to exclude him as a suspect. After learning from Joshua that he (Joshua) and the defendant had gone to Z Food Mart together, Lieutenant Chambers obtained the video footage from the store and provided a still photo for the media to air. According to Lieutenant Chambers, after the photo was shown on CrimeStoppers, two people, including Joshua, called in. Joshua identified the person in the photo as the shooter. Regarding Cassandra's identification of Kendall in the photo

lineup, Lieutenant Chambers testified she was in the bathroom "doing her hair," getting ready to go out that night, and she saw the person pass in the reflection in the bathroom mirror.

Tommy Cummings testified that he knew the defendant and Dedrick, and that he grew up with them. According to Cummings, on May 14, 2012 (the day of the shooting), he saw the defendant and Dedrick together in a four-door white car near his (Cummings) house in the Glen Oaks area. Cummings recalled that Dedrick was in the driver's seat, and he (Cummings) talked to them for about ten minutes, between 9:00 p.m. and 9:30 p.m.

DNA evidence revealed that the defendant had contact with the white four-door vehicle that Dedrick and Joshua were in when they were shot. According to Jennifer Hornyak, a DNA analyst with Cybergenetics (a Pittsburgh-based company specializing in computer-based DNA interpretation), the defendant's DNA was found on the rear, exterior passenger-door handle of the white vehicle.

Based on the foregoing evidence, a jury, despite any inconsistencies, could have rationally concluded that the defendant was in the same vehicle as Joshua and Dedrick and that the defendant shot both of them. Particularly, the jury chose to believe the testimony of Joshua regarding his identification of the defendant as the shooter. It is the trier of fact who makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the factfinder's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." **State v. Tate**, 2001-1658 (La. 5/20/03), 851 So.2d 921, 929, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). See **State v. Weary**, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311-12, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006).

The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. **State v. Taylor**, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See **State v. Mitchell**, 99-3342 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. **State v. Quinn**, 479 So.2d 592, 596 (La. App. 1st Cir. 1985). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. **State v. Higgins**, 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).

When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Moten**, 510 So.2d 55, 61 (La. App. 1st Cir.), writ denied, 514 So.2d 126 (La. 1987). The jury heard all of the testimony and viewed the evidence presented to it at trial and found the defendant guilty. In finding the defendant guilty, the jury clearly rejected the defense's theory of misidentification. See **Moten**, 510 So.2d at 61. Although there were inconsistencies in the testimony, there was sufficient evidence for the jury to have found the necessary elements of second degree murder and attempted second degree murder proved beyond a reasonable doubt. See **Weary**, 931 So.2d at 312.

After a thorough review of the record, we find the evidence negates any reasonable probability of misidentification and supports the jury's unanimous

guilty verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the second degree murder of Dedrick Droze and the attempted second degree murder of Joshua Mumphrey. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

This assignment of error is without merit.

## SENTENCING ERROR

Under La. Code Crim. P. art. 920(2), we are limited in our review to errors discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence. After a careful review of the record, we have found a sentencing error.

For a conviction of second degree murder, the offender shall be imprisoned at hard labor for life without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). According to the sentencing transcript, the trial court failed to provide that the life sentence on count 1 was to be served at hard labor.[2] Louisiana Code of Criminal Procedure article 920(2) authorizes consideration of such an error on appeal. Further, La. Code Crim. P. art. 882(A) authorizes correction by the appellate court.[3]

We find that correction of this illegally lenient sentence does not involve the exercise of sentencing discretion and, as such, there is no reason why this court should not simply amend the sentence. Accordingly, since a sentence at hard labor was the only sentence that could be imposed, we correct the sentence by providing

---

[2] The minutes indicate the sentence is at hard labor. When there is a discrepancy between the minutes and the transcript, the transcript must prevail. **State v. Lynch**, 441 So.2d 732, 734 (La. 1983).

[3] An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. La. Code Crim. P. art. 882(A).

11

that it be served at hard labor. See **State v. McGee**, 2008-1076 (La. App. 1st Cir. 2/13/09), 2009 WL 390809, *4 (unpublished). We remand to the trial court for correction, if necessary, of the commitment order.

## CONCLUSION

For the following reasons, we affirm the convictions and sentence on count 2 and amend sentence on count 1 by providing that it be served at hard labor, and affirm as amended. We further remand this matter for the correction of the commitment order and for transmission of the amended record to the Department of Corrections.

**CONVICTIONS AND SENTENCE ON COUNT 2 AFFIRMED; SENTENCE ON COUNT 1 AMENDED, AND AFFIRMED AS AMENDED; REMANDED WITH INSTRUCTIONS.**