# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2022 KA 0502

## STATE OF LOUISIANA

## VS.

## KEVIN ABIMAEL GUZMAN

Judgment Rendered: **NOV 1 7 2022**

\* \* \* \* \*

On Appeal from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
No. 12-16-0217

The Honorable Fred T. Crifasi, Judge Presiding

\* \* \* \* \*

| | |
|---|---|
| Hillar C. Moore, III<br>District Attorney<br>Dylan C. Alge<br>Assistant District Attorney<br>Baton Rouge, Louisiana | Attorneys for Appellee<br>State of Louisiana |
| James Stokes Holt, IV<br>Baton Rouge, Louisiana | Attorney for Defendant/Appellant<br>Kevin Abimael Guzman |

\* \* \* \* \*

**BEFORE: McDONALD, McCLENDON, AND HOLDRIDGE, JJ.**

**HOLDRIDGE, J.**

The defendant, Kevin Abimael Guzman, was charged by bill of information with sexual battery of M.Z. (a victim under the age of thirteen years), (count I); sexual battery of J.P. (a victim under the age of thirteen years) (count II); and sexual battery of J.P. (count III), violations of La. R.S. 14:43.1.[1] He pled not guilty on all counts. Following a jury trial, on count I, he was found not guilty, and on counts II and III, he was found guilty as charged by nonunanimous verdicts. He moved to vacate the verdicts on counts II and III, and the motion was granted. See **Ramos v. Louisiana,** __ U.S. __, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020).

Thereafter, the defendant was charged by amended bill of information with sexual battery of J.P. (a victim under the age of thirteen years) (count I); and sexual battery of J.P. (count II), violations of La. R.S. 14:43.1. He pled not guilty on both counts. Following a jury trial, on counts I and II, he was found guilty as charged by unanimous verdicts. On count I, he was sentenced to twenty-five years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. On count II, he was sentenced to ten years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence, two years to run consecutively to count I, and eight years to run concurrently with count I. He now appeals raising three assignments of error. For the following reasons, we affirm the convictions and sentences.

## FACTS

The victim, J.P., testified at trial. Her date of birth is September 3, 1999. She went to Park Forest Elementary School for sixth and seventh grades. During that period, she lived with her parents and two brothers in an apartment on North Sherwood Forest Boulevard in Baton Rouge, Louisiana. J.P. and her family were

---

[1] We reference J.P., who at the time of the commission of the offense was a minor under eighteen years of age and a victim of sex offenses, only by her initials. See La. R.S. 46:1844(W).

2

active in Communidad Misionera Natanael (Natanael) - a church that was located next to their apartment complex.

In the summer of 2012, when J.P. was twelve years old, she and her family usually attended Friday and Sunday services at Natanael. The defendant was also a member of the church, where he did "production work." According to J.P., the defendant had visited her home to play video games with her brothers.

J.P.'s first time sleeping away from home was in June 2012 at a Natanael sponsored family retreat in Lake Charles. She attended the event with her uncle, aunt, and three-year-old cousin. J.P. was permitted to arrive early for the retreat with her aunt and some other church members, including the defendant, because her aunt worked at the church.

On the ride to the retreat, the defendant asked J.P. if she wanted to "make cheesecake." J.P. thought the defendant was talking about baking. When the defendant put his hand on her thigh, she "realized that making cheesecake wasn't exactly what [she] thought it was." The defendant moved his hand up J.P.'s thigh, but she moved it away. J.P.'s aunt and cousin were also in the vehicle, but had both fallen asleep.

The retreat facility was "like a campus." Suites were available for rent so that families could stay together. Additionally, two residential buildings, one for the men and one for the women, were on either side of a building where services were held. J.P. shared a suite with her uncle, aunt, and cousin.

After arriving at the retreat, J.P.'s aunt asked her to go to the men's residential building. At the residential building, J.P. was approached by the defendant and his friend, Jose. No one else was present because the attendees were arriving later that evening. The defendant grabbed J.P.'s forearm and pushed her into a room with a bed. Jose grabbed J.P.'s cousin and took him away. The defendant tried to kiss J.P.

3

on her mouth and neck. She was in shock. She told the defendant that she "didn't want to do that[.]" The defendant grabbed her hand and forearm and took her to the bathroom. The defendant put J.P. against a wall and told her to take her pants off. J.P. was still in shock and did not respond. The defendant then unbuttoned J.P.'s shorts and pulled them and her underwear down. J.P. asked the defendant what he was doing. He replied, "open your legs up." J.P. stated, "No." J.P. indicated the defendant put his fingers on her vagina. The defendant then stopped for a minute and took out a condom. He attempted to put the condom on, but stated, "[o]h sh\*\*, my condom ripped." J.P. "hurried up and put [her] bottoms back on, and ... ran out of the room[.]" Jose was outside of the room with J.P.'s cousin. J.P. took her cousin away from Jose and went back to her suite. She remained at the retreat the entire weekend, and she rode back home with her family.

J.P. did not report the incident to her aunt or mother because she was in shock about what had happened. When asked why she had not reported the incident to her mother when she called J.P. at the retreat, she stated:

> I did want to tell her, but it was -- the environment we had grown up in at church was always condemning any type of sexual acts or anything to do with that. And I had thought to myself who is going to believe a 12 year old girl compared to a guy who is much older.

Following the incident, J.P. continued attending Natanael with her family. She did so because she had not told her family about the incident. She also continued to see the defendant at Natanael.

According to J.P., the defendant assaulted her again approximately a few weeks or a month later. J.P. was still twelve years old. On the day of this incident, during the lunch hour, the defendant came to the apartment where J.P. lived with her family. The only person at home with J.P. was a child she was babysitting. Someone knocked on the front door, and J.P. opened the door to see who was there and it was the defendant. The defendant asked if J.P.'s brothers were home. J.P.

4

told the defendant her brothers were not there and nobody was home. The defendant lingered at the door and asked if he could come in. J.P. said, "no, there is nobody home." The defendant moved closer to the door and entered the apartment. J.P. told the defendant "no," but did not want to cause a commotion or alert other people in the apartment complex.

Once inside the apartment, the defendant gave the child J.P. was babysitting a video game and told him to go upstairs. The defendant told J.P., "let's try to do … what we were trying to do last time." J.P. said, "no" multiple times. Every time she said "no," however, the defendant moved closer to her "as if he was trying to intimidate [her]." J.P. then told the defendant that she was not going to do that. He grabbed her forearm, took her to the downstairs half bathroom, and closed the door. He told J.P. to get on her knees. When she did not comply, he used his hands to force down her shoulders until she was down on her knees. He then pulled down his pants and told her "you have to suck it." J.P. testified, "I didn't want to put it in my mouth, and so what [the defendant] did was he grabbed … the back of my head, and he pulled me forward, and as I was doing what he told me to do[,] he said don't bite." J.P. began gagging as the defendant kept his hands on the back of her head. She felt ashamed and was in a panic. The defendant ejaculated and told J.P. she had to swallow it. The defendant then pulled up his pants. J.P. was crying and turned her body to face the sink. The defendant told her she "did a good job" and left. J.P. did not tell anyone about the incident because she was ashamed of what had occurred.

According to J.P., the defendant assaulted her a third time a few months after the incident at the apartment. J.P. was thirteen years old at the time of this incident. It occurred when she was at Natanael on a Saturday for a youth gathering. After a sermon, the pastor's wife asked J.P. to go fetch the defendant from the production room in one of the other buildings. J.P. did not want to go and did not want to be

alone with the defendant, but she did as instructed to avoid having to tell the pastor's wife about what the defendant had done.

J.P. went to the production room and opened the door. The defendant was sitting in a chair with wheels and turned to see who was there. While standing at the door, J.P. told the defendant that the pastor's wife needed him. Before J.P. could leave, the defendant rolled over to her and said, "no, wait, come here." The defendant grabbed J.P. by the wrists and pulled her into the room. He forced her to sit on his lap. He put his arm over her mid area. She was "really afraid," and tried to find the courage to fight back and get out. The defendant realized that J.P. was resisting and got up and grabbed her arm. He took her into the soundproof room and closed the door. J.P. had never been in the room because only authorized people were allowed in the room. The defendant told J.P. to get on her knees and "suck his d***." J.P. refused, stating "I am not doing this again[.]" The defendant used his hands to force down J.P.'s shoulders until she was down on her knees. He then pulled his pants and underwear down and grabbed the back of her head. He put his penis in J.P.'s mouth and forced her to suck it until he ejaculated. He then removed his hands from her head. He told J.P. she did a good job and offered her a coke and a pat on the back. J.P. testified she felt ashamed, dirty, and "in a sense useless." She told the defendant that what was happening "wasn't right." J.P. stated, "[the defendant] nudged it off, ... basically saying like who is going to believe you." She explained "[the defendant] was insinuating that he was much older, and that it could be seen as I just had a crush on him and I was making it all up." J.P. did not think anyone would believe her. J.P. did not disclose the assaults until she was fifteen or sixteen years old. She then told her mother about the assaults after her mother told her that one of her family members had been molested at Natanael.

The defendant testified at trial. His date of birth is November 23, 1992. He was nineteen in 2012. He admitted he sat next to J.P. on the ride to the retreat, but denied putting his hand on her knee. He also denied saying anything sexual to her. He indicated he was never alone with J.P. at the retreat, and denied pulling her into a side room. He denied sexually assaulting J.P. at the retreat. He also denied ever going to the apartment where J.P. lived or assaulting her there. Lastly, he denied ever being in the audio room of Natanael with J.P. and denied sexually assaulting her there.

The defendant testified he was a part-time employee of Natanael and described his position as "technical." He stated that the pastor of Natanael had sent him to Panama for a month to work with the pastor's son-in-law at his company which produced T.V. commercials. The defendant indicated he was not a deacon at the church because he was too young. The defendant also testified that only authorized people were allowed to be in the production room of Natanael, but he was authorized.

## RIGHT TO PRESENT A DEFENSE

In assignment of error number one, the defendant contends the trial court erred in overruling his objection to the court's granting of the State's pre-trial motion in limine. He argues the granting of the motion in limine restricted his defense on cross-examination by preventing him from impeaching a witness by stating there was a previous trial. He does not specify which witness, if any, he was prevented from impeaching.

The effect of granting a new trial is to set aside the verdict or judgment and to permit retrial of the case with as little prejudice to either party as if it had never been tried. La. Code Crim. P. art. 857. At a minimum, Article 857 is intended to mask from the jury members the fact that a defendant before them has previously been

7

tried, with the jury's possible conclusion that he has previously been convicted. **State v. Reed**, 324 So.2d 373, 380 (La. 1975). It is a jury's duty to determine a criminal defendant's guilt or innocence on the strength of the evidence presented to it, uninfluenced by the fact that on an earlier occasion (and under circumstances so defective as to invalidate the conviction), he had been found guilty of the offense by a different jury. When a jury is informed by the State that the accused was convicted of the crime on a previous occasion, the defendant's right to a fair trial ... has been violated. **State v. Lee**, 346 So.2d 682, 684 (La. 1977).

A criminal defendant's right to present a defense is guaranteed by the Sixth Amendment of the United States Constitution and Article I, §16 of the Louisiana Constitution. Evidentiary rules may not supersede the fundamental right to present a defense. See U.S. Const. amend. VI; La. Const. art. I, §16; **State v. Van Winkle**, 94-0947 (La. 6/30/95), 658 So.2d 198, 201-02. However, constitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence; only that which is deemed trustworthy and has probative value can be admitted. See **State v. Governor**, 331 So.2d 443, 449 (La. 1976). Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or waste of time. La. Code Evid. art. 403. Ultimately, questions of relevancy and admissibility of evidence are discretion calls for the district court. Such determinations regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion. See **State v. Mosby**, 595 So.2d 1135, 1139 (La. 1992); **State v. Bridges**, 2014-0777 (La. App. 1st Cir. 3/6/15), 2015 WL 997162, *4, writ denied, 2015-0675 (La. 2/26/16), 187 So.3d 467.

Prior to trial, the State filed a motion in limine seeking to exclude evidence that there was a prior trial and a prior not guilty verdict, to-wit:

The State looks to [La. Code Crim. P. art.] 857 regarding the effects of granting a new trial. The article clearly states that on the retrial there should be as little prejudice to either party as if it had never been tried. To bring up the fact that there was a prior trial and one of the counts for that trial was not even regarding the current victim, J.P., is irrelevant and confusing to the jury. Should issues of impeachment come about during the trial, the State requests that it be handled by stating "during a previous proceeding under oath" as a way to address impeachment if necessary.

The trial court granted the motion. The defendant objected to the ruling of the court, arguing it restricted, or would operate to restrict, the defense on cross-examination.

At trial, defense counsel asked the defendant if he knew of any reason why J.P. would make the allegations against him. The defendant replied, "[w]ell, I speculate the main thing is, you know, the event with her cousin." Defense counsel replied, "[p]ardon me?" Thereafter, the State objected as the defendant answered, "[t]he event with her cousin where she too – made a false accusation."

At a sidebar conference, the State objected to speculation. The State argued the defendant did not know why "[J.P. had] said the things she said." Additionally, the State argued the defendant was "trying to get in desperately that there was a cousin (M.Z.) that also accused him." Defense counsel stated that he thought the defendant was going to answer, "No, I don't know." The court ruled:

> This court previously excluded from evidence any reference to the other matter that was included in the first trial, but that the State agreed not to introduce in this case. And that was the understanding going forward. So[,] consistent with that[,] I am going to sustain the objection.

There was no clear abuse of discretion in the trial court's ruling on the State's motion in limine. The defendant was only prohibited from referencing the prior trial and the count concerning M.Z. He was not prevented from presenting a defense to the allegations of J.P. in the instant trial. The State made no reference in the instant trial to any prior allegations of M.Z. Further, the defense candidly admitted the only

9

answer it was looking for from the defendant was that he did not know why J.P. would make accusations against him. Thus, the probative value, if any, of testimony concerning alleged "false allegations" of M.Z. from a former trial in the instant trial concerning only J.P.'s allegations was substantially outweighed by the danger of unfair prejudice to the State, confusion of the issues, and misleading the jury. See **State v. Nixon**, 2017-1582 (La. App. 1st Cir. 4/13/18), 250 So.3d 273, 280, writ denied, 2018-0770 (La. 11/14/18), 256 So.3d 290 ("[t]he fundamental right to present a defense does not require the trial court to admit irrelevant evidence or evidence with such little probative value that it is substantially outweighed by other legitimate considerations.").

This assignment of error is without merit.

## OBJECTION TO TESTIMONY

In assignment of error number two, the defendant contends the trial court erred in overruling his objection to the victim's brother, a State witness's, description of the defendant as a leader in the church. He argues A.P., J.P.'s brother, was not familiar with the defendant's position in the church.

Louisiana Code of Evidence article 701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
>
> (1) Rationally based on the perception of the witness; and
>
> (2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

The trial court is vested with much discretion in determining which opinion testimony shall be received into evidence as lay or expert testimony. **State v. Morgan**, 2012-2060 (La. App. 1st Cir. 6/7/13), 119 So.3d 817, 827. Thus, if the testimony constitutes a natural inference from what was observed, no prohibition against it as the opinion of a non-expert exists as long as the lay witness states the

10

observed facts as well. Therefore, the reviewing court must ask two pertinent questions to determine whether the trial court properly allowed such testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness's observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. **State v. Bringier**, 2021-0476 (La. App. 1st Cir. 12/30/21), 340 So.3d 975, 983, writ denied, 2022-00157 (La. 4/5/22), 335 So.3d 837.

A.P. testified he was the brother of J.P.[2] He lived with her, his brother, and his parents in an apartment on North Sherwood Forest Boulevard. He was not best friends with the defendant, but "knew him from [Natanael]" and he played soccer and video games with the defendant. According to A.P., the defendant had been to his house "a couple of times." The State asked A.P. if the defendant was "unique in the church in some way[.]" A.P. replied, "[the defendant] was -- he was up there. He was like a – kind of like a deacon, a crew leader." The defense objected, arguing the question called for speculation. The court overruled the objection, noting that A.P. had indicated he was familiar with the defendant and his role in the church. Thereafter, the State asked A.P. if the defendant had been a deacon, and A.P. replied affirmatively. The State asked A.P. "[w]hat other types of things did [the defendant] do that was his role in the church besides being a deacon?" A.P. replied, "[the defendant] was over the media like the audio, the production area." A.P. elaborated, "[the defendant] would put on slide shows for the pastor. [The defendant] would mess with the music during his services, I mean, the cameras, photography." On cross-examination, A.P. stated he knew the defendant was a deacon in the church

---

[2] In order to protect the identity of J.P., we reference this witness only by his initials. See La. R.S. 46:1844(W); **State v. Anderson**, 2015-1043 (La. App. 1st Cir. 2/24/16), 2016 WL 759166, *1 n.3.

11

because he operated the media equipment, and he would get appointed by the pastor to do special things for him.

There was no abuse of discretion in the overruling of the defense objection. A.P. socialized with the defendant. A.P.'s opinions that the defendant was "kind of like a deacon," or "a crew leader," or "a deacon" at Natanael were rationally based on his perception and helpful to a clear understanding of his testimony and the determination of a fact in issue, i.e., the defendant's access to a restricted area where he allegedly assaulted J.P.

This assignment of error is without merit.

## AUTHENTICATION OF A DOCUMENT

In assignment of error number three, the defendant contends the trial court erred in overruling his objection to the introduction into evidence of a document. He argues another State witness, J.P.'s mother, verified the authenticity of the document, but her husband signed it.

Louisiana Code of Evidence article 901, in pertinent part, provides:

**A. General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

**B. Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Article:

**(1) Testimony of witness with knowledge.** Testimony that a matter is what it is claimed to be.

**(2) Nonexpert opinion on handwriting.** Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

Questions of admissibility of evidence are discretion calls for the trial court and should not be overturned absent a clear abuse of that discretion. For admission, it suffices if the custodial evidence establishes that it was more probable than not

12

that the object is the one connected to the case. A preponderance of the evidence is sufficient. Moreover, any lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than its admissibility. Ultimately, a chain of custody or connexity of the physical evidence is a factual matter to be determined by the jury. **State v. Dillon**, 2018-0027 (La. App. 1st Cir. 9/21/18), 2018 WL 4520463, *7.

F.P.E. testified at trial through an interpreter.[3] She was the mother of J.P. In 2012, she lived with her husband and children at the North Sherwood Forest apartment. At that time, J.P. was twelve years old and attended Park Forest Middle School. The family moved to Central, Louisiana around the last week of July, 2012.

During her testimony, the State presented a Universal Transfer and Withdrawal Form (UTWF) to F.P.E to show the timeline when the victim and her family moved to Central. She stated the form "had to be done so that [J.P.] could go to school in Central." F.P.E. indicated her husband could read English, and she could read some English. F.P.E. testified she was familiar with her husband's signature after twenty-nine years of marriage and the UTWF, specifically the front page (purportedly bearing her husband's signature), was familiar to her. In response to questioning by the defense, F.P.E. stated she was present when her husband signed the form. F.P.E. further testified she did not understand everything on the form, but it was read to her and her husband.

The defense objected to the introduction of the form, arguing F.P.E. had not signed the form. The court overruled the objection, finding F.P.E. had recognized the document, explained how she was familiar with it, testified she was able to read a portion of it, testified that it was read and explained to her, and had identified its purpose.

---

[3] In order to protect the identity of J.P., we reference this witness only by her initials. See footnote 2, supra

13

There was no clear abuse of discretion in the overruling of the defense objection. The challenged document was sufficiently authenticated. The State established it was more probable than not that the document was connected to the case. F.P.E.'s testimony indicated the form offered by the State was the UTWF prepared to allow J.P. to go to school in Central and that it was signed by F.P.E.'s husband in her presence. See La. Code Evid. art. 901(B)(1) & (2).

This assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the defendant's convictions and sentences.

**AFFIRMED.**

14